Jorge Luis RODRIGUEZ, Plaintiffs,

v.

INVESTCO, L.L.C., d/b/a Sandy Lake Towers, Defendant.

No. 6:02–cv–916–Orl–31KRS.

United States District Court, M.D. Florida, Orlando Division.

Feb. 24, 2004.

William Nicholas Charouhis, Charouhis & Associates, P.A., Daniel Ruiz, Miami, FL, Todd W. Shulby, Law Office of Todd W. Shulby, P.A., Davie, FL, for Plaintiffs.

Richard W. Epstein, Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger,

Lauderdale, FL, Michael E. Marder, Myrna L. Maysonet, Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger, P.A., Orlando, FL, for Defendant.

## MEMORANDUM OPINION

GREGORY A. PRESNELL, District Judge.

This case involves alleged violations of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181, *et seq.* The Court held a bench trial on January 9, 2004, after which the parties submitted post-trial memoranda. The Court submits the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

## I. The Parties.

Plaintiff, Jorge Luis Rodriguez, suffered a diving accident in 1985, which rendered him a quadriplegic. He is wheelchair-bound and has limited use of his arms and hands. Until recently, he lived and worked in Miami. Approximately one year ago, he moved to Deltona, Florida, and is currently unemployed. During the past few years, Mr. Rodriguez has filed almost 200 lawsuits against various establishments, alleging violations of the ADA. In most of these cases, Mr. Rodriguez has been represented by the same counsel, William Charouhis.

Defendant, Investco, LLC, is a Florida limited liability company formed to acquire a hotel known as Sandy Lake Towers ("the Facility").[1] Defendant's parent, Westgate Resorts, Ltd., is a time-share developer and operator. Defendant acquired title to the Facility in July 2002, by foreclosing a mortgage given by the prior owner who was in bankruptcy. Defendant acquired the Facility to convert it into a time-share community and thereafter manage it.

## II. Findings of Fact

### A. *The Facility*

The Facility, now known as Westgate Palace, is comprised of two 18–floor towers with floors numbered 1 through 19 (excluding 13), an intervening clubhouse, and surrounding grounds. Tower No. 1 is currently being renovated. Tower No. 2 is vacant and is not involved in this dispute. There are a total of 204 guest rooms in Tower No. 1.

Shortly after its acquisition of the Facility, Defendant hired an architect, James Garritano, to produce plans and specifications for renovation of floors 2 through 19 in Tower No. 1.[2] Other professionals are being used to address renovation of the Facility's common areas and parking lot. Defendant also hired an ADA consultant, Diana Ibarra, to assist with ADA compliance.

Renovation of Tower No. 1 is proceeding in two phases: (1) the top floors 10 through 19 and (2) the bottom floors 2 through 9. At trial, Defendant produced plans for two of the floors in phase one: floors 12 and 15. Defendant has obtained permits to renovate Floor 15 and has begun doing so. During phase one of the renovation project, the top 9 floors have been vacated. Rooms on the lower floors, however, are being rented during the renovations. Once the renovations are complete, Defendant claims that the Facility will be fully ADA compliant.

### B. *Plaintiff's Visit and Plans to Return*

Plaintiff stayed at the Facility in May 2002, before Defendant owned or operated

---

1. Defendant's name has since been changed to Westgate Palace LLC.

2. Defendant's conceptual planning for these renovations actually commenced in-house prior to the acquisition.

it. Plaintiff wished to stay two nights but stayed only one, claiming that he was not able to enjoy the Facility because of barriers he encountered. Accordingly, he called his attorney, who inspected the property on August 3, 2002. On August 5, 2002, the attorney advised Plaintiff that the hotel was not ADA compliant, and thus filed this lawsuit four days later.

At trial, Plaintiff testified that he wished to return to the Facility for another visit, and had made a reservation for the nights of June 22 and 23, 2004. This reservation was made two days before the trial commenced. Plaintiff could not explain why he would choose to stay at the Facility, when other nearby hotels admittedly meet his needs. (Doc. 78, Tr. at 120–121).[3]

## C. *The Lawsuit*

Plaintiff filed this lawsuit on August 9, 2002, against the Facility's former owner who, at the time was in bankruptcy.[4] Shortly thereafter, Plaintiff learned that Defendant had acquired the Facility; and on September 17, 2002, filed a motion for leave to amend the complaint.[5] On September 26, 2002, Plaintiff filed his Amended Complaint against Defendant (Doc. 9). Since filing his Amended Complaint, Plaintiff has been aware that Defendant intends to substantially renovate and convert the Facility into a time-share operation.

## D. *The Renovations and ADA Compliance*

Defendant's architect testified that he had been continuously involved in this renovation project since the fall of 2002. One aspect of the project is to make the Facility ADA compliant. In this regard, Defendant is providing for a total of ten handicap-accessible units, seven of which are fully ADA complaint and three with roll-in showers. The parties agree that 10 units will satisfy the numerical requirement under the ADA guidelines. According to Defendant's architect, these units, when completed, will comply with the ADA.

Plaintiff called an expert witness, Thomas Ricci, who introduced a report (Pl.Ex.1) listing the deficiencies inherent at the time of Defendant's acquisition.[6] Mr. Ricci opined that all of these deficiencies are capable of correction (without major demolition) in order to comply with the ADA. Indeed, he admitted that, except for a few minor exceptions,[7] the renovation plans submitted by Defendant would achieve this result.[8] Defendant's expert also confirmed that the on-going and planned renovations would cure any ADA-related problems.

## III. Legal Analysis

### A. *A Cottage Industry is Born.*

Congress enacted the ADA on June 26, 1990. Its stated purposes are:

---

3. The reason why Plaintiff made the reservations is obvious: attempted compliance with the statutory requirement to avail ADA remedies. *See infra.*

4. It would appear, therefore, that Plaintiff violated the automatic stay by filing this suit.

5. The Motion was granted on September 25, 2002. (*See* Doc. 8).

6. Mr. Ricci's report is exaggerated and misleading. For example, he criticizes access to a non-existent tennis court, and he criticized the size, shape, and slope of non-existent handrails, grab bars, etc. Moreover, the pho-

tos attached to his report are not indexed and cannot be matched to the violation being alleged.

7. The evidence shows that these items can easily be corrected in the field during construction.

8. Mr. Ricci also questioned whether the accessible units would comply with the dispersion requirements of the regulations. The Court finds no basis in the evidence to reach this conclusion.

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

The ADA provides, in pertinent part, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of ... facilities ... or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *Id.* § 12182(a). The ADA further specifically defines acts and omissions that constitute unlawful discrimination. *See id.* §§ 12182(b)(2)(A), 12183(a).

Congress did not, however, create any sort of administrative process to ensure compliance with the ADA's public accommodation provisions. Rather, the ADA contains a private right of action, *id.* § 12188(a), and right of action for the Attorney General, *id.* § 12188(b). Although the ADA's private remedies are limited to injunctive relief, *id.* § 12188(a), the ADA, nevertheless, contains an incentive to private litigation—an attorney's fee provision.[9]

This statutory scheme has resulted in an explosion of private ADA-related litigation. For example, in this District alone, there have been hundreds of Title III cases filed in the past three years. These cases have been filed by a relatively small number of plaintiffs (and their counsel) who have assumed the role of private attorneys general.[10]

This lawsuit is a case in point. Here, suit was filed less than a week after Plaintiff's counsel verified the ADA deficiencies. There was no effort to communicate with the property owner to encourage voluntary compliance,[11] no warning and no offer to forbear during a reasonable period of time while remedial measures are taken.

■ Why would an individual like Plaintiff be in such a rush to file suit when only injunctive relief is available? Wouldn't conciliation and voluntary compliance be a more rational solution?[12] Of course it

9. "In any action ... commenced pursuant to this chapter, the court ..., in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs...." 42 U.S.C. § 12205.

10. 579 cases have been filed by only five organizations (and a few of their associated members): Access 4 All, Inc.; Access Now, Inc.; Association for Disabled Americans, Inc.; Access for America, Inc.; and Access for Disabled, Inc. During this period, Plaintiff, Jorge Rodriguez, represented by Mr. Charouhis, also filed 11 individual cases in this

District. Mr. Charouhis has been counsel in 75 cases in this District during the past three years. In 27 of these cases, the Court has had occasion to issue 33 Show Cause Orders for his failure to abide by the Court's Orders.

11. Had Plaintiff's counsel contacted the first named defendant, he would have learned that the entity he was about to sue was in bankruptcy.

12. Indeed, the great majority of these cases are settled before trial with the property own-

would, but pre-suit settlements do not vest plaintiffs' counsel with an entitlement to attorney's fees. *Buckhannon Bd. and Care Home, Inc., v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Moreover, if a plaintiff forebears and attempts pre-litigation resolution, someone else may come along and sue first.[13] The current ADA lawsuit binge is, therefore, essentially driven by economics-that is, the economics of attorney's fees.[14]

### B. *To Design And Construct Non–Compliant Facilities.*

■ At trial in the instant case, Plaintiff claimed that the Facility is in violation of section 12183(a)(1) of the ADA and that Defendant has, therefore, discriminated against Plaintiff. In this regard, Plaintiff correctly identified an injury-discrimination-that, according to section 12183(a)(1), includes "a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities ..." 42 U.S.C. § 12183(a)(1). Plaintiff, nevertheless, did not (and could not) establish that Defendant committed that form of discrimination.

When the words of a statute are plain, a court should look no further to determine the statute's meaning. *CBS Inc. v. Prime-Time 24 Joint Venture,* 245 F.3d 1217, 1222 (11th Cir.2001). In regard to section 12183(a)(1) of the ADA, it is plain that that provision does not create liability that runs *in rem.* Section 12183(a)(1) defines certain omissions (failures in the acts of design and construction) that constitute "discrimination for purposes of section 12182(a)." *Id.* Although it is somewhat de-emphasized in section 12182(a)'s grammatically passive language, the basic prohibition is that an owner, lessee (or lessor), or operator of a place of public accommodation shall not discriminate, on the basis of disability, against any individual "in the full and equal enjoyment of the ... facilities ... or accommodations of any place of public accommodation." *Id.* § 12182(a). As to facilities built for first occupancy after January 26, 1993, the ADA's plain language, therefore, makes it unlawful for *a person* to design and construct a place of public accommodation that fails to meet ADA accessibility guidelines.[15] *Id.* §§ 12182(a), 12183(a)(1).

Defendant purchased the Facility at a bankruptcy foreclosure sale on July 11, 2002. Although Defendant concedes that

---

er agreeing to remediate within a reasonable period of time.

**13.** This Court is already experiencing competing claims by different plaintiffs over that same facility. *Cf. Disability Advocates v. Cocoa Beach Hotel,* Case No. 6:03–cv–1770–Orl–22KRS and *Access 4 All, Inc. v. Cocoa Beach Hotel,* Case No. 6:03–cv–1564–Orl–22KRS.

**14.** One might reasonably ask whether attorney's fees should be awarded where no effort is made pre-suit to obtain voluntary compliance. After all, if the litigation achieves no result other than that which could be accomplished by agreement, what social or economic value has been added by the lawyer's decision to file a suit without warning? Indeed,

under this scenario, it would seem that litigation carries only negative economic value-it has accomplished nothing but expense and waste of precious judicial resources.

**15.** The ADA provided the Attorney General with a mandate to issue accessibility guidelines from which to determine ADA compliance. *See* 42 U.S.C. § 12186(b); *cf. Kinney v. Yerusalim,* 9 F.3d 1067, 1071 (3rd Cir. 1993). These guidelines provide a regulatory safe harbor, in that, if a person designs and constructs a place of public accommodation in compliance with the guidelines, the person has complied with the ADA. *Association for Disabled Am. v. Concorde Gaming Corp.,* 158 F.Supp.2d 1353, 1361 n. 4 (S.D.Fla.2001).

the Facility was designed and constructed for first occupancy later that 30 months after July 26, 1990, Defendant established at trial that it had no involvement in the original design or construction of the Facility. Defendant simply purchased an existing non-compliant facility.

Plaintiff relies on *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d 1357 (S.D.Fla.2001), and similar cases to no avail when he argues that Defendant is liable for a violation of section 12183(a). *South Florida Stadium*, in pertinent part, holds that a failure to abide by ADA accessibility guidelines in post-ADA (new) construction evidences intentional discrimination against disabled persons. *Id.* at 1362. In the instant case, that is an irrelevant point. In light of the ADA's plain language, the intentional discrimination evidenced when one fails to abide by ADA accessibility guidelines can only be the intentional discrimination of a person who designs and constructs a place of public accommodation or causes that design or construction to be done. 42 U.S.C. §§ 12182(a), 12183(a)(1). Accordingly, the Court finds that Defendant did not violate section 12183(a)(1).

C. **To Fail to Remove Architectural Barriers In Existing Facilities When Removal is Readily Achievable.**

Section 12182(b) provides the "construction" of what constitutes prohibited discrimination for purposes of section 12182(a)—that is, discrimination against an individual "on the basis of disability in the full and equal enjoyment of ... facilities ... or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a)-(b)(2). As one of its "[s]pecific prohibitions," section 12182(b)(2)(A) provides that such "discrimination includes, ... (iv) a failure to remove architectural barriers ... in existing facilities ... where such removal is readily achievable...." *Id.* § 12182(b)(2)(A)(iv).

Once again, when the meaning of the statutory language is plain, a court should look no further than the language of a statute. *CBS Inc.*, 245 F.3d at 1222. "In the absence of a statutory definition of a term, [courts are to] look to the common usage of words for their meaning." *Id.* (citation omitted). From section 12182(b)(2)(A)(iv)'s defined and undefined terms, it is plain, for instance, that an owner of an existing facility used for public accommodation has a duty, where it is readily achievable, to remove architectural barriers to disabled persons' access. Furthermore, because Congress did not define "existing facilities," it is plain from the common usage of those words that the section concerns facilities that have already been built.[16]

---

16. Notably, despite the common meaning of the undefined term "existing facilities," Plaintiff argues that those words mean that section 12182(b)(2)(A)(iv) applies only to facilities designed and built for first occupancy before January 26, 1993. Plaintiff argues, accordingly, that only section 12183(a)(1) can apply to the Facility. To read the term "existing facilities" so narrowly is not a sensible reading of the statute as a harmonious whole. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1173 (11th Cir.2003). Rather, Plaintiff strains for some self-serving consistency which does not comport with the ADA's plain meaning and balance of interests.

In light of section 12183(a)(1)'s plain meaning, to hold that section 12182(b)(2)(A)(iv) applies only to buildings built for first occupancy before January 26, 1993, would leave a gaping loophole in the ADA. Specifically, a person who did not violate section 12183(a)(1), but who purchased a facility previously designed and constructed in violation of that section, would not need to remove any architectural barriers from a facility, because the facility would not be considered an "exist-

In the instant case, although the Facility is an existing one, Plaintiff has not shown that Defendant failed, despite the ready achievability of doing so, to remove architectural barriers to access. Indeed, the evidence is clearly to the contrary— Defendant has made (and continues to make) substantial efforts that are likely to make the Facility ADA compliant beyond the requirements of section 12182(b)(2)(A)(iv).[17] There is no evidence that Defendant's renovation efforts do not meet the requirement of removing architectural barriers to access where such removal is readily achievable. This point, however, is of lesser concern than a more basic failing in Plaintiff's presentation at trial.

### D. *To Avail ADA Remedies.*

Section 12188(a) provides remedies available "to any person who is being sub-jected to discrimination on the basis of disability in violation of [sections 12181 *et seq.*] or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183...." 42 U.S.C. § 12188(a)(1). Accordingly, in a private lawsuit, relief is available only to a disabled person who is being subjected to a defendant's discrimination or who is about to be subjected either to a defendant's failure to design and construct an ADA-compliant facility or to alter a facility consistent with section 12183's requirements. *Id.*

At trial, Plaintiff did not establish that he "is being subjected" or "is about to be subjected" to prohibited discrimination by Defendant.[18] Defendant did not own the Facility at the time Plaintiff stayed there. More important, however, is Plaintiff's lack of a continuing connection to the

---

ing facility." The ADA's plain language allows no such a loophole.

Sections 12182(b)(2)(A)(iv) and 12183(a)(1) cover different discriminatory acts. A person who designs and constructs a non-ADA compliant facility for first occupancy after January 26, 1993, remains liable for that act. Although the person may sell the property and thereby escape liability from private lawsuits, the person is still subject to liability in a lawsuit instituted by the Attorney General. 42 U.S.C. § 12188(b). Furthermore, a person who purchases an existing facility that was built in violation of section 12183(a)(1) still must remove architectural barriers to disabled persons' access if it is "readily achievable." *Id.* § 12182(b)(2)(A)(iv). While section 12183(a)(1)'s strict accessibility requirements may not be met, *id.* § 12183(a)(1), the purchaser is not in the position of the person who designed and built the facility and, in doing so, could have avoided creating barriers to access without much difficulty or expense. *See Anderson v. Pennsylvania Dept. of Pub. Welfare*, 1 F.Supp.2d 456, 464 (E.D.Pa.1998). Unlike, for instance, the language in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the ADA's plain language does not purport to impose potentially astronomical liability or confiscatory burdens on someone who simply purchases an existing non-compliant facility. *See id.* §§ 12182(b)(2)(A)(iv); 12183(a)(1).

**17.** "Readily Achievable," as the ADA defines it, means "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). Obviously, removal of architectural barriers, especially the raft of barriers about which Plaintiff complains, cannot occur instantaneously. "Readily Achievable" connotes a reasonable period of time within which to remove architectural barriers. To hold otherwise would subject the purchaser of an existing non-compliant facility to strict and potentially astronomical liability for the original owner's transgressions. As previously noted, such an interpretation is as odds with the ADA's plain language and balance of interests.

**18.** Section 12188(a)'s reference to persons "about to be subjected" to discrimination is a reference to potential violations of section 12183. As previously discussed, Defendant did not commit and likely will not commit such a violation.

Facility. At trial, Plaintiff was evasive and willfully ignorant, totally lacking credibility. His explanation for his initial visit to the Facility was disingenuous, and he did not convey any honest desire to return there. Plaintiff's testimony left the distinct impression that he is merely a professional pawn in an ongoing scheme to bilk attorney's fees from the Defendant.

In sum, Plaintiff not only relied on an inapplicable legal theory to argue that Defendant is engaging in unlawful discrimination, but also failed to establish that Defendant has subjected Plaintiff to any discrimination in regard to the Facility. Plaintiff, therefore, failed to establish any basis for relief under the ADA.

## IV. Conclusion

For the forgoing reasons, the Clerk is directed to enter judgment for Defendant and against Plaintiff, with costs assessed against Plaintiff.