### Steven BROTHER and Robert Short, Plaintiffs,

v.

### CPL INVESTMENTS, INC. d/b/a The Ramada Limited, Defendants.

### No. 02–23680–CIV..

United States District Court, S.D. Florida, Miami Division.

March 22, 2004.

---

10. Given this decision, the Court need not determine whether the exclusion would apply if the *"Race* test" was employed.

William Nicholas Charouhis, William N. Charouhis & Associates, Lori I. Barkus, William N. Charouhis & Associates, Miami, FL, for Steven Brother, Robert Short, plaintiffs.

Norman Davis, Steel Hector & Davis, Norman Davis, Steel Hector & Davis, Miami, FL, for CPL Investments, Inc dba Ramada–South Miami / Dadeland, Charles L. Leemon, III dba Ramada South Miami / Dadeland, defendants.

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING NON–JURY TRIAL

MARTINEZ, District Judge.

Plaintiffs bring this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq,* and seek only injunctive relief. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court conducted a non-jury trial in this action on March 2, 2004, and March 3, 2004. Having carefully considered the testimony and evidence presented at trial, the briefs of counsel, and for the reasons set forth below, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with its obligations under Rule 52 of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. The Parties

1. Defendant CPL Investments, Inc ("CPL") is an Illinois corporation, which owns the Ramada Limited hotel located at 7600 North Kendall Drive, Miami, which is in close proximity to Baptist Hospital. Charles L. Leemon III is President of CPL. There is no dispute that the Ramada Limited is a public accommodation as defined in 42 U.S.C. § 12181(7).

2. The hotel today has 122 rooms on six floors. It was constructed in the mid–1970s. Rooms 610 and 611 were constructed at that time and designated by the hotel as accessible to disabled guests. Sometime during the early 1990s, the hotel began a construction project to add additional rooms to the first floor, including room 120 which is accessible to disabled guests. The evidence indicates that the project was substantially completed by October 1995. Presently, a total of three rooms are designated by the hotel as accessible to disabled guests: rooms 610 and 611 on the sixth floor, and room 120 on the ground floor.

3. Plaintiff Steven Brother is a paraplegic and utilizes a wheelchair. He is also hearing-impaired. Mr. Brother has no other impairment. By his own admission,

in the last year he has been a plaintiff in more than 50 other suits in Florida which were brought pursuant to the ADA.

4. Mr. Brother has never stayed at the Ramada Limited. He inspected the hotel one afternoon in October, 2002, to determine whether it was accessible for him. Mr. Brother viewed rooms 610 and 611. Mr. Brother did not view room 120. Mr. Brother alleges that he was considering spending a night there with his wife to commemorate their wedding anniversary. He chose the hotel because of its proximity to the Cheesecake Factory, a nearby restaurant his wife likes. During his inspection, Mr. Brother encountered what he alleges were barriers.

5. Nevertheless, at some subsequent date he made a reservation to stay at the hotel in October, 2003, again thinking to commemorate his wedding anniversary and take his wife out Mr. Brother did not keep the reservation because his counsel of record told him that no changes had been made to the hotel. Mr. Brother is considering making a reservation to stay at the hotel in October, 2004, again possibly to commemorate his wedding anniversary and take his wife out.

6. Plaintiff Robert Short is a paraplegic and is confined to a wheelchair. He has no other impairment. Mr. Short resides in Daytona Beach, Florida, and St. Petersburg, Florida.

7. Mr. Short is employed primarily as a consultant to companies to assist them in complying with the Occupational Health and Safety Administration requirements. Mr. Short visits South Florida a lot for his work, and one of his clients is located near the Ramada Limited. Thus, he plans to return to South Florida and the hotel. Mr. Short stayed at the hotel for one night on two occasions, in April, 2002 and in January, 2003. He stayed in rooms 610 and 611. Mr. Short did not stay in room 120.

## B. Procedural Background

8. Mr. Brother was the only plaintiff when the Complaint was filed on December 30, 2002. Mr. Short entered this case on July 7, 2003 when the Court approved the filing of an Amended Complaint. Plaintiffs allege the existence of multiple violations of the ADA at the hotel. The allegations of violations in the Amended Complaint are essentially the same as those in the original Complaint.

9. Initially, Mr. Leemon was sued in his individual capacity, but later dismissed by Order of the Court dated February 9, 2004.

10. By Order dated February 19, 2004, the Court denied Defendant's motions for summary judgment and to dismiss because of fact questions concerning whether barriers alleged by the Plaintiffs existed in the first place; whether alleged barriers have been removed; and whether the alleged barriers will be remedied in alterations to be undertaken by the hotel in 2004.

11. Subsequently, by Order dated February 26, 2004, the Court clarified that Mr. Short, who stayed overnight at the hotel on two occasions prior to filing suit, and Mr. Brother, who inspected the hotel in October, 2002, had standing to bring suit. However, the Court further stated that Plaintiffs' standing is limited in two ways. First, the Plaintiffs have standing to raise only those claimed ADA violations which pertain to their personal disabilities, namely, paraplegia and hearing impairment. Second, Plaintiffs have standing only with respect to those barriers of which they had actual knowledge at the time their complaint was filed. This would include barriers listed in the Amended Complaint and identified by Plaintiffs at their depositions. However, this would not include those violations later identified by Plaintiffs after reviewing their expert's report.

12. By a separate Order also dated February 26, 2004, the Court ruled on the

Defendant's Motion in Limine to Exclude Portions of Thomas J. Ricci's Expert Report. Because this is a non-jury trial, the motion was treated as a motion to strike. To the extent portions of the expert report identified alleged barriers unrelated to Plaintiffs' disabilities, the items were stricken from the report. Where it was unclear whether the alleged barriers related to Plaintiffs' disabilities, the Court reserved ruling until trial. The Court further reserved ruling to the extent the expert report identified barriers which Defendant argued did not physically exist.

13. In the same Order, the Court denied Defendant's request to strike portions of the expert report on the grounds that the report did not make the required showing that the removal of each listed barrier was readily achievable. In so doing, the Court considered the fact that the Defendant has admitted the ability to pay and the expert report identified alleged barriers on the basis of the ADA Accessibility Guidelines, 28 C.F.R. Part 36, Appendix A. Thus, at that stage of the proceedings, the Court stated that "the accommodations sought by the Plaintiffs appear to be reasonable in the general sense." However, the Court added the caveat that "this determination is made under the facts of the case, and in light of the disputed issues of material fact. The Court does not agree with Plaintiffs' assertion that the ADA Accessibility Guidelines, specifically 28 C.F.R. § 36.304, provide a list or examples of barriers whose removal are *per se* readily achievable."

### C. Alleged Barriers Encountered by Plaintiff Brother [1]

14. At trial, Mr. Brother testified that upon his inspection, he found a slope in the parking lot and a bump at the front door. Mr. Brother admitted that he was able to navigate the slope and the bump.

15. Mr. Brother stated that the front desk was too high. He could not see over the counter to read the lips of the hostess. Mr. Brother stated that he was not aware that the front desk routinely provided a clip board for registration. He admitted that he would be able to lip read if the

1. Mr. Brother testified at a deposition on June 10, 2003 that he encountered the following barriers during his 45–minute inspection rooms 610 and 611 in October, 2002:

(1) Hard to move around in pool area because of chaise lounges (*See* Dep. of Mr. Brother, D.E. No. 42–1, filed on November 12, 2003, at 39–40);

(2) Could not get to shower room in pool area (*Id.* at 39);

(3) Tables in pool area not accessible (*Id.* at 40–41);

(4) No way to use pool; no way to get out of pool (*Id.* at 40);

(5) Could not reach rescue pole or life preserver in pool area (*Id.* at 55);

(6) Tables in main lobby area too low (*Id.* at 39);

(7) Registration desk too high (*Id.* at 45);

(8) Sidewalk on exterior has no curb cuts (*Id.* at 48);

(9) Lip on front entrance way (*Id.* at 47);

(10) No TTY units for hearing-impaired in the guest rooms (*Id.* at 39, 44);

(11) Electric outlets in the guest rooms not accessible (*Id.* at 60);

(12) Turn knobs on lamps in the guest rooms hard to manage (*Id.* at 60);

(13) Curtain pull rods in the guest rooms were too high to reach (*Id.* at 39);

(14) Could not get to air conditioner, table in the way in the guest rooms (*Id.* at 40);

(15) Not enough room for 360–degree turn in wheelchair in the bathroom in the guest rooms (*Id.* at 42);

(16) No grab bars for toilet in the guest rooms (*Id.* at 39);

(17) Toilet booster seat had arms, not usable from wheelchair in the guest rooms (*Id.* at 43), and

(18) Could not roll beneath lavatory because of skirt in front in the guest rooms (*Id.* at 39,44).

These items are the sources of potential injury identified by Mr. Brother.

attendant came out from behind the desk upon seeing him approach the registration desk in his wheelchair.

16. A member of the housekeeping staff showed Mr. Brother the two accessible rooms on the sixth floor and other areas of the hotel, such as the pool area. Rooms 610 and 611 were the only rooms Mr. Brother saw during his inspection. The rooms appeared the same, except one had double beds and the other had a king size bed. Mr. Brother did not know that there was an accessible room on the first floor.

17. Mr. Brother stated that there was a bathtub, not a roll-in shower. There was a seat in the bathtub, but it was not a permanent seat. When he saw this "Mickey Mouse" seat, Mr. Brother conjectured that he would easily flip out of the tub chair if he tried to use it to transfer to the bathtub.

18. As for the toilet, Mr. Brother stated that there was a booster seat with arms attached, but no mounted grab bars. Mr. Brother did not inquire of management or the front desk whether an alternative booster seat was available.

19. Mr. Brother found it difficult to maneuver the wheelchair in the room because of the furniture. In the room with two beds, the beds were too close together. He also had problems accessing the air conditioning and the lamps.

20. At the breakfast buffet, the counter came up to Mr. Brother's chin. He admitted that he was unaware of a hostess at the buffet and that he did not ask if there was one. He also admitted that when he conducted his inspection of the hotel, it was after lunch so the breakfast buffet would have been closed down.

21. Mr. Brother did not see a "deaf kit" in the rooms, which he stated would include a TTY machine for the telephone, visual smoke detectors, and connectors for power supplies. When he inquired about one, the housekeeper escorting him stated that she did not know what a deaf kits was and, then stated that the hotel did not have one. Mr. Brother admitted that he did not consult with the front desk or management about this.

22. Mr. Brother stated that when he viewed the pool, there was a lip around it. He did not say why this lip created a barrier. He also stated that the life preserver and rescue hook were positioned too high, and furniture blocked the pathways around the pool.

23. Mr. Brother did not provide testimony or introduce evidence of any other alleged barrier.

### D. Alleged Barriers Encountered by Plaintiff Short [2]

24. At trial, Mr. Short testified that the front desk presented a barrier to him be-

---

2. Mr. Short testified at a deposition on October 1, 2003 that he encountered a number of barriers during his two one-night stays at the hotel in April, 2002, and January, 2003. These alleged barriers include.

(1) Bathroom maneuvering was too difficult; doors open inward (See Dep. of Mr. Short, D.E. No. 46–1, filed on November 12, 2003, at 68, 70, 81);

(2) Bathtub seat was not adequate: they later brought a tub seat (Id. at 72, 82, 84);

(3) Toilet is in middle of bathroom; not easy to transfer to it ( Id. at 85);

(4) Curtain pull rod was too short (Id. at 69);

(5) Could not "get to" switch on a floor lamp (Id. at 69–70);

(6) Not enough space between double beds (Id. at 70);

(7) Toilet seat not easily accessible; had generic toilet seat with bars ( Id. at 71);

(8) Incline in parking area too steep (Id. at 74);

(9) Registration counter not accessible (Id.);

(10) Food at breakfast buffet not reachable (Id. at 75), and

(11) Tables in lounge area are "kind of difficult" ( Id.).

cause it was too high and he could not see over the counter. He expressed security concerns because he could not see what was going on behind the counter, such as someone committing identify theft. He stated that he would have this type of security concern even when his inability to reach the counter was accommodated by a hotel employee giving him a clipboard or coming out from behind the counter to meet him upon his approach to the desk. However, Mr. Short admitted that an individual standing in front of the registration desk would have the same security concerns and inability to see what was being done behind the counter. Mr. Short also admitted that in his deposition he stated that if offered a clipboard to assist in his registration in the hotel this would be an acceptable accommodation.

25. Mr. Short stated that it was difficult to transfer to the toilet in his room. He stated that the way the toilet was positioned in the room, there was nothing to grab on to. There were no grab bars next to the toilet in the bathroom, and although the toilet had a booster seat with attached arms, the seat felt insecure. Mr. Short admitted that he did not ask for a different booster seat without the attached arms. He stated that the issue was not the height of the toilet booster, but the need for a grab bar to assist in transfer. Mr. Short admitted that if the toilet were moved so that grab bars were mounted near it, this would be satisfactory.

26. When Mr. Short went to take a shower, there was a bathtub and not a roll-in shower. The hotel subsequently provided him with a shower seat that Mr. Short stated was like lawn furniture, but he admitted the shower seat did not have a seat made of woven straps. He further admitted that in his deposition testimony he agreed that if a shower stool were available, this would be acceptable. Mr. Short

complained about the shower seat the next morning to the manager who assured him that renovations were planned, such as additional accessible rooms on the first floor. Mr. Short states that the manager assured him that he would not encounter these problems the next time he stayed at the hotel.

27. However, Mr. Short states that on his second visit he found things to be the same. On his second visit he stayed in a different room with a different furniture configuration, but essentially the same accessibility problems. Mr. Short admitted that if chairs were removed from the room, this would alleviate much of his concern over the room's configuration.

28. Mr. Short states that on this second visit he again found a bathtub and not a roll-in shower. There was a tub chair already located in the room, but it did not mount or affix securely to the bathtub. Mr. Short stated that the tub chair was a basic device from a general store like Wal-Mart, not a medical supply store. He stated that he was able to work himself onto the tub seat, but it was wobbly and difficult to sit in. However, Mr. Short admitted that the stool was usable, and that in deposition testimony he stated that the shower stool would work for him.

29. Mr. Short also found the curtain pull on the drapes was too short. He admitted that if a longer pull were there, it would be satisfactory.

30. Mr. Short could not access the air conditioning controls. He admitted that if chairs were removed from the room and there was a thermostat at a low height, this would be satisfactory.

31. Mr. Short found it difficult to locate an outlet for his laptop. He could not recall whether there were lamps on the desk and night stand with outlets.

These items are the sources of potential injury identified by Mr. Short.

32. Mr. Short stated that the beds in the room were too close together for wheelchair access. He admitted that if the double beds in the room were 36 inches apart, this would be satisfactory.

33. Mr. Short found it difficult to pull the door open of the room when exiting the room because the door pulled in to open.

34. The next morning, Mr. Short went to the breakfast buffet area. The juice machines were too high. It was difficult to reach other items. He could not remember whether the tables were high enough to be accessible. In the end, Mr. Short did not eat because it was too hard to get things. He did not see a hostess at the buffet, nor did anyone offer him assistance. However, Mr. Short admitted that if a full-time hostess were always available at the buffet, he would have access to the food at the buffet.

35. Mr. Short did not provide testimony or introduce evidence of any other alleged barrier.

### E. *Plaintiffs' Expert Witness Thomas J. Ricci*

36. Mr. Ricci conducted an inspection of the hotel in June, 2003, and drafted a lengthy expert report based on his inspection. Items in the report are not numbered.

37. Portions of the report identify alleged barriers which do not physically exist. Portions of the report identify alleged barriers that are not in guest areas. Mr. Ricci admitted that he did not inquire as to whether some areas were employee areas.

38. Portions of the report, in addition to those stricken by the Court prior to trial, identify alleged barriers which do not relate to Plaintiffs' disabilities. Mr. Ricci admitted that he did not know what disabilities the Plaintiffs had when he drafted

his report. He stated that it was not his obligation to know the Plaintiffs' disabilities.

39. Mr. Ricci's report does not include an assessment of the Defendant's ability to pay for required modifications or the proposed cost of most of the modifications, independent of Defendant's ability to pay. Mr. Ricci admitted that when he drafted his report, he did not know Defendant had admitted ability to pay.

40. Mr. Ricci admitted that his report identifies barriers on the basis of features that do not comply with the ADA Accessibility Guidelines. His report is a composite of barriers created from a checklist at the Department of Justice's (DOJ) website.[3]

41. Mr. Ricci explained that under the ADA there are two standards: the new construction standard; and the alteration standard. Mr. Ricci admitted that in drafting his expert report, he applied the new construction standard to everything.

42. Mr. Ricci misidentifies the accessible entrances to the hotel. One of these entrances is not an entrance and another one is located opposite of where Mr. Ricci claims it is Mr. Ricci found improper slopes in the parking lot.

43. In the pool area, Mr. Ricci found cross slopes exceeding those allowed by the ADA Accessibility Guidelines and a lack of maneuvering clearance. He also found that the tables around the pool had insufficient knee clearance and recommended purchasing a replacement table at a cost of $200. Mr. Ricci stated that the shower head was located too high, but admitted that he reached this conclusion by application of the ADA Accessibility Guidelines requirements for showers in an indoor bathroom. Mr. Ricci also admitted that the ADA Accessibility Guidelines do

---

3. The DOJ is responsible for implementing the ADA. *See* 42 U.S.C. § 12186(b).

not say anything specifically about pool accessibility, but rather, that he extrapolated these requirements from other general provisions of the ADA Accessibility Guidelines speaking to equal provision of services and privileges. He further admitted that his report fails to suggest how the Defendant can make the pool accommodating and accessible.

44. Mr. Ricci found the hotel registration counter was too high. He recommended adding a folding shelf for a cost of $100.

45. Mr. Ricci found the tables in the seating area adjacent to the lobby did not have sufficient knee clearance. He suggested purchasing a new table.

46. Mr. Ricci found that the dining counter of the breakfast buffet was too high. He suggested lowering the counter at a cost of $900.

47. Mr. Ricci found that room 120 had insufficient maneuvering clearance at the entry door, and the door was not automatic.

48. Mr. Ricci found that room 120 had too much furniture and maneuvering clearance was inhibited.

49. Mr. Ricci found that room 120 did not have electrical outlets adjacent to the phones.

50. Mr. Ricci found that the telephones did not have the proper volume controls and were not hearing aid compatible. He suggested changing the phones for a cost of $50 per phone.

51. Mr. Ricci found that room 120 did not have sufficient turning space in the bathroom. The toilet was not mounted 18 inches off the side wall, which inhibited transferring to the toilet. The grab bars were mounted to the face of a cabinet wall and were placed too high. The shower controls were not in the proper position. The tub seat was not mounted and had likely been purchased from a medical sup-

ply store. The tub did not have the proper grab bars Mr. Ricci admitted that in suggesting a different tub seat, he listed dimensions which were not prescribed by the ADA Accessibility Guidelines.

52. As for room 610, the entrance door opened in, and it was not automatic. There was insufficient maneuvering clearance.

53. Mr. Ricci found that room 610 lacked appropriate visual notification devices.

54. Mr. Ricci found that the telephones did not have the proper volume controls and were not hearing aid compatible. He suggested changing the phones for a cost of $50 per phone.

55. Mr. Ricci found that room 610 had insufficient maneuvering space in the bathroom, and the door opened into the bathroom. The toilet grab bars did not comply with the ADA Accessibility Guidelines. The toilet seat was too low. The portable booster seat provided was not stable. There was insufficient knee clearance at the vanity. The shower controls were not in the proper position. The tub did not have the proper grab bars.

56. As for room 611, Mr. Ricci's critique was essentially identical to that of room 610.

57. Lastly, Mr. Ricci found that additional kits with modification devices should be available for rooms besides the accessible rooms.

### F. The Ramada Limited

58. The hotel is in close proximity to Baptist Hospital, which makes it convenient for patients who prefer to stay at the Ramada Limited instead of checking in to the hospital. When the ADA took effect, the hotel took steps to become compliant and has actively worked to remain ADA compliant and to understand its obligations

under the ADA. The hotel conducts annual audits to ensure continued compliance.

59. The hotel is responsive to guest complaints and internal suggestions from housekeeping, maintenance and the front desk. Mr. Leemon meets with the hotel manager once a week to review all guest comments and to determine an appropriate plan of action. The hotel has not previously received complaints about the items Plaintiffs complain of in this suit. Upon receipt of Plaintiffs complaints, which occurred in the form of the instant suit and not prior to filing the suit, the hotel has worked to make modifications to ensure accessibility.

60. The hotel's front desk personnel are trained to pay attention to the needs of all guests. They are also trained to maintain eye contact with all guests. The hotel has a routine practice of providing a clipboard to guests in wheelchairs to assist in registration. Front desk personnel are trained to come out from behind the counter when registering guests in wheelchairs.

61. In light of Plaintiffs' complaint that the entrance doors to the accessible rooms created a barrier, the hotel reversed the doors to open outward rather than inward.

62. In light of Plaintiffs' complaint that the bathroom doors in the accessible rooms created a barrier, the hotel reversed the doors to open outward rather than inward.

63. The hotel has toilet booster seats, both with and without arms, available for its guests. Prior to the instant suit, Defendant has not had complaints about the booster seats. Since Plaintiffs have filed this suit and made complaints about the booster seats, the hotel has relocated the toilets in the accessible rooms so that they are closer to the bathroom vanity. The relocation of the toilet enabled the hotel to install grab bars mounted on the wall behind the toilet and on the vanity adjacent to the toilet. The hotel has also elevated the toilet seat to 19 inches. A section of the vanity has been removed by the hotel to increase knee clearance.

64. The hotel has two types of shower seats available for guest use, including one with an extended seat and arms to assist transfer.

65. Since the filing of this suit, the hotel has removed furniture from the accessible rooms and adjusted the furniture in the rooms to increase maneuverability throughout the room. In the accessible room with double beds, the beds have been moved more than 36 inches apart. Whenever possible, the hotel assigns the same housekeeping personnel to these rooms so that the improved configuration is maintained. The housekeeping manager is also responsible for maintaining the configuration.

66. The thermostats in the room have also been placed at a low height to ensure access.

67. The accessible rooms have several electrical outlets. There is also an electrical outlet on the base of the lamps located at the desk and the bedside table.

68. As for curtains in the accessible rooms, the hotel has changed to longer rods to ensure access.

69. The rooms have a desk phone and bedside phone. All phones have a red light which indicates an incoming call and a message available at the front desk.

70. The hotel bought three deaf kits in 1993, which it refers to as "tech kits." The hotel has continued to acquire tech kits since that time and presently has twelve such kits. The hotel's tech kits include: a pillow vibrator, a device that flashes when someone knocks on the door; a phone amplifier; and a portable smoke detector with a strobe light to alert guests of a fire.

71. The hotel maintains twelve separate TTY devices which enable hearing impaired guests to use the phone.

72. The hotel has a break fast buffet area. There is a hostess at the breakfast buffet every day to assist guests. In light of Plaintiffs' complaints that there was not a dining table with sufficient knee clearance, the hotel acquired an additional table which is accessible to guests in wheelchairs.

73. The hotel has a pool and terrace area. There are chaise lounges on the east side of the pool, but hotel does not have furniture on the west side of the pool. The terrace area is not over-furnished. There are a life ring and rescue hook in the pool area. These items are located at a low level within the reach of a guest in a wheelchair.

74. The hotel was unable to find manufacturer who made outdoor furniture, such as an umbrella table, that was compliant with the ADA Accessibility Guidelines. So, the hotel modified an existing table to increase knee clearance and render it compliant.

75. Any of the foregoing factual finding which may represent conclusions of law are adopted as conclusions of law. *See Miller v. Fenton,* 474 U.S. 104, 114–15, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

## II. CONCLUSIONS OF LAW

### A. Standing

 Plaintiffs do not have standing to complain about alleged barriers which are not related to their respective disabilities. *See Steger v. Franco,* 228 F.3d 889, 893 (8th Cir.2000); and *Ass'n for Disabled Americans, Inc. v. Concorde Gaming Corp.,* 158 F.Supp.2d 1353 (S.D.Fla.2001).

Plaintiffs do not have standing to complain about alleged barriers which they were unaware of at the filing of their complaint. *See Access Now, Inc. v. South Florida Stadium Corp.,* 161 F.Supp.2d 1357, 1365–66 (S.D.Fla.2001), and *Resnick v. Magical Cruise Co., Ltd.,* 148 F.Supp.2d 1298, 1302 (M.D.Fla.2001).

The Ramada Limited has three accessible guest rooms: 120, 610, and 611. Rooms 610 and 611 are on the sixth floor. They were built in the 1970s when the hotel was originally constructed. Rooms 120 was constructed during the early 1990s and was substantially completed by October, 1995. Plaintiffs and their expert find fault with all three rooms, but Plaintiffs have standing only to allege barriers encountered in rooms 610 and 611.

During his inspection, Mr. Brother only saw rooms 610 and 611; Mr. Brother did not see room 120. Mr. Short stayed in rooms 610 and 611, but not room 120. Therefore, Plaintiffs have no standing to allege the existence of barriers in room 120 because they had no actual knowledge of any barriers in room 120 at the time they filed their complaint.[4] *See Moyer v. Walt Disney World Co.,* 146 F.Supp.2d 1249, 1253–54 (M.D.Fla.2000) (granting partial summary judgment due to lack of standing in Title III case, where the plaintiff had not visited certain of the defendant's theme parks until after the litigation was initiated). Without actual knowledge of barriers, Plaintiffs have not suffered an "injury in fact" which establishes standing at the time of the filing the complaint. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (setting forth a three apart test for standing).

---

4. Although there is evidence that rooms 610 and 611 are almost identical, there is no evidence that room 120 is similar or identical to those rooms. The Court cannot assume that the three rooms are uniform. Therefore, the Court does not reach the issue of whether the futile gesture exception, 42 U.S.C. § 12188(a)(1), is applicable.

■ In addition, the Court finds that Mr. Brother does not have standing to bring this suit at all.[5] First, Mr. Brother only performed a visual inspection of the hotel. He did not perform any other, hands-on inspection. He did not speak to the manager or ask the manager questions. Thus, many of Mr. Brother's alleged injuries are purely speculative.

■ Second, Mr. Brother testified that in the last year, he has been a plaintiff in more than 50 other suits in Florida which were brought pursuant to the ADA. Mr. Brother has never stayed at the Ramada Limited. He performed a visual inspection of the hotel in October, 2002, shortly before the filing of the instant suit, allegedly with the desire to spend the night there with his wife to commemorate their wedding anniversary.[6] Mr. Brother made a subsequent reservation at the Ramada Limited for October, 2003, but admitted that he did not keep the reservation because his counsel of record told him that no changes had been made to the hotel.[7] In light of his extensive litigation, the fact that he never stayed at the hotel, and his testimony about why he did not keep a subsequent reservation, the Court does not credit Mr. Brother's allegation that he intended to patronize the hotel. *See Rodri-*

*guez v. Investco, LLC,* 2004 WL 345857 (M.D.Fla.2004) (finding that: plaintiff lacked a continuing connection to the defendant's facility; plaintiff's explanation for his first visit to the facility was disingenuous; and plaintiff did not convey any honest desire to return to the facility).

In sum, Plaintiffs lack standing as to room 120 because neither Plaintiff had actual knowledge of alleged barriers in that room. In addition, Mr. Brother is without standing to bring this suit. His injuries are largely speculative. His claim that he intended to patronize the hotel prior to suit is not credible, nor are his claims that he intends to use the Ramada Limited in the future.

### B. Applicable Standard of ADA Compliance

There are two standards of compliance under the ADA: the new construction standard and the alteration standard. New construction is the highest standard, and it applies to public accommodations designed or constructed after January 26, 1992 and to that portion of a facility altered after January 26, 1992. *See* 42 U.S.C. § 12183(a); H.R.Rep. No. 101–485(III) at 60, reprinted at 1990 U.S.C.C.A.N. 445, 483 (explaining that

---

5. *See* ¶ 11, *supra,* and *D'Lil v. Stardust Vacation Club,* 2001 WL 1825832 (E.D.Cal.), at *4 (holding that although plaintiff had alleged sufficient facts to establish standing at the summary judgment stage, plaintiff still bears the burden of proving her allegations at trial before the court will determine that the plaintiff has standing to bring suit). *See also Lujan v. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130 (stating that although generalized allegations of an injury may be sufficient at the pleading stage, when the court must accept all material allegations as true, they will not suffice to carry plaintiff's burden of proof on standing at the trial stage).

6. Mr. Brother resides in Miami–Dade County. *See* Dep. of Mr. Brother, D.E. No. 42–1, at 3.

7. ADA plaintiffs who seek prospective injunctive relief, but only allege past discrimination that is unlikely to be repeated do not have standing. *See Hoepfl v. Barlow,* 906 F.Supp. 317, 323 (E.D.Va.1995), and *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329, 1334 (N.D.Cal. 1994). Standing is established at the time of the filing of the Complaint. *See Moyer v. Walt Disney World Co.,* 146 F.Supp.2d at 1253–54. Thus, while Mr. Brother's subsequent reservations may demonstrate that his injury will be redressed by a favorable decision, they do not demonstrate that he has suffered an "injury in fact" which establishes standing at the time of the filing the complaint. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130.

"[b]ecause it costs far less to incorporate accessible design into the planning and construction of new buildings and of alterations [as compared to retrofitting existing structures], a higher standard of 'readily accessible to and usable by' persons with disabilities has been adopted in the ADA for new construction and alterations"); and 28 C.F.R. Part 36, App. B, Section 36.402 (stating that with respect to altered portions"[t]his part does not require alterations; it simply provides that when alterations are undertaken, they must be made in a manner that provides access"). The new construction standards are contained in 28 C.F.R. Part 36, and the ADA Accessibility Guidelines are set forth in Appendix A of Part 36.

■ Existing facilities must comply with the ADA, but their obligation to comply is governed by the alteration standard. Under this standard, the ADA Accessibility Guidelines provide guidance as to whether unlawful architectural barriers exist in a facility, *Pascuiti v. New York Yankees*, 87 F.Supp.2d 221, 226 (S.D.N.Y. 1999), but "the Court cannot determine the Defendants' liability from finding that elements of the [Defendant's facility] deviate from those standards." *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d at 1368. Allowing the Plaintiffs to use the ADA Accessibility Guidelines in this manner does not alter the ADA's lesser requirements for existing facilities. In order to establish that the defendant has violated the ADA, the Plaintiffs still must proffer evidence that removal of a given barrier is readily achievable. *See Pascuiti v. New York Yankees*, 87 F.Supp.2d at 226. That standard requires a showing that removal is "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In addition, "[a]t trial, a defendant may be able to rebut evidence [of noncompliance] by showing that despite the technical noncompliance, the challenged accommodation in fact allows disabled persons effective access." *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d at 1368.

In this case, Plaintiffs presented evidence that Defendant has failed to strictly comply with the ADA Accessibility Guidelines. However, the Ramada Limited was constructed in the 1970s, such that the alteration standard applies, not the new construction standard. Thus, Plaintiffs may compare facilities at the Ramada Limited with the requirements laid out in the ADA Accessibility Guidelines as part of their effort to establish the existence of individual barriers to access, but deviation from the ADA Accessibility Guidelines is not determinative. *Id.*

■ Plaintiffs assume that because the hotel began a construction project to add additional rooms to the first floor during the early 1990s, the stricter new construction standard should be applied to the hotel. However, this argument fails. First, neither Plaintiff viewed or occupied room 120. Thus, Plaintiffs do not have standing to assert claims based on alleged violations found in room 120. Second, the new construction standards apply to altered portions of public accommodations. *See* 42 U.S.C. § 12183(a)(2) (referring to the "altered portions of the facility") Undertaking an alteration in one portion of an existing facility does not automatically make the entire existing facility subject to the new construction standards. Thus, Plaintiffs have not established that the new construction standard applies to the entire Ramada Limited.

### C. Establishing a Prima Facie Case

Plaintiffs bear the initial burden of suggesting a method of removal for each barrier identified, and proffering evidence that their suggested method is readily achievable. *See Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d at

1371 (granting summary judgment to defendant where "Plaintiffs completely failed to suggest a plan of modification, much less demonstrate that such modification would be readily achievable"); and *Pascuiti v. New York Yankees,* 87 F.Supp.2d at 223 (holding that to establish a prima facie case, plaintiff must prove that a facility is not readily accessible to and usable by disabled individual and to suggest a plausible method of removing barriers to access).

■ Plaintiffs are not equipped by knowledge, training or education in the many technical and engineering elements that can be affected by particular removal methods. Thus, the suggestion of methods of removal and a showing that the suggested methods are readily achievable require guidance by an expert. To this end, Plaintiffs retained Mr. Ricci, an expert, who inspected the hotel premises after the lawsuit was initiated and who produced a written report on his findings in June, 2003.

Mr. Ricci's report identifies, by actual count, some 166 individual barriers at the hotel that he contends constitute violations of the ADA. Much of the report is irrelevant because it: identifies barriers which do not exist; identifies barriers without relation to Plaintiffs' disabilities; and identifies barriers for which Plaintiffs do not have standing. Furthermore, the report provides very little guidance because most of the 166 items listed in the Ricci report do not include suggested methods of removal or a showing that the removal of barriers by such methods could be readily achieved as a matter of law.

In addition, as the expert, Mr. Ricci's role is to apply the ADA Accessibility Guidelines to the context of this case and produce an expert report establishing his opinion and the basis for his opinion. *See* Fed.R.Civ.P. 26; *Access Now, Inc. v. South Florida Stadium Corp.,* 161 F.Supp.2d at 1368 (stating that a "finding of noncompliance [with the ADA Accessibility Guidelines] is not tantamount to finding an ADA violation; plaintiff carries the additional burden of showing that removal of the barriers is readily achievable").

The context of this case has several key components. First, the Plaintiffs have specific disabilities, namely paraplegia and hearing impairment. Mr. Ricci admitted that when he prepared his report, he did not know what disabilities the Plaintiffs had. He stated that it was not his obligation to know the Plaintiffs' disabilities.

Second, the Plaintiffs have complained about barriers which they encountered at the hotel, not every conceivable variation from the ADA Accessibility Guidelines which may be unearthed at the hotel. Mr. Ricci's report does not take into account the Plaintiffs' standing.

Third, Defendant has admitted its ability to pay for any required modifications. Mr. Ricci admitted both in his report and in his testimony that he did not know that Defendant had admitted ability to pay when he drafted his report.[8] Mr. Ricci believes that without information on Defendant's ability to pay, he does not have to consider the cost of his proposed recommendations. As for Plaintiffs, they argue that because

---

8. In his report, Mr. Ricci states

I am of the opinion that it has not been determined based on the readily achievable standards, since I do not know the financial strength of the owner or the parent corporation or the parent corporation, nor has the attorney for the defendant supplied that information to plaintiff's counsel as of this

date that I am aware. Thus, I have no way of determining readily achievable.

If Plaintiffs intend to rely upon Mr. Ricci's testimony and his expert report, they should have provided him with current and complete information regarding Defendant's ability to pay so that Mr. Ricci could revise his report accordingly.

Defendant has admitted the ability to pay any required alterations, anything can be done. This argument is neither rational or reasonable. It is the Plaintiffs' who bear the ultimate burden of proof in establishing that there are barriers and that the ADA requires removal of the barriers. *See D'Lil v. Anaheim Hotel Partnership,* 43 Fed.Appx. 96 (9th Cir.2002) (holding that where a defendant admits ability to pay for a proposed modification the inquiry under 42 U.S.C. § 12181(9) does not end). Plaintiffs cannot rely upon the Defendant to make their case.

Fourth, the Ramada Limited is a specific facility. As such, the ADA will apply to the Ramada Limited depending upon: when the hotel was built; whether alterations were made to the hotel; when such alterations began; and how the ADA Accessibility Guidelines will apply considering the structure of the hotel.[9] As discussed supra, Mr. Ricci applied the new construction standard to the entire Ramada Limited, not just the portion altered after January 26, 1992. His report fails to state the basis for applying this standard. In addition, upon identifying an alleged barrier, his report fails to analyze whether the modifications he suggests are readily achievable under 42 U.S.C. § 12181(9), nor did his testimony fill the gaps and demonstrate this to the Court.

Overall, Mr. Ricci's report is not a reliable assessment of the Ramada Limited, and its does not assist Plaintiffs' in establishing their prima facie case. The report is confusing and difficult to follow. It was drafted based upon assumptions and omissions of relevant information. It fails to demonstrate that barrier removal is readily achievable. To the extent Mr. Ricci's

report does support a prima facie case, the Court finds that the report's deficiencies and inaccuracies cast serious doubt upon the credibility and reliability of the remainder of the report. As a result, Plaintiffs have not made a prima facie case of discrimination on the basis of disability in violation of the ADA.

### D. Mootness

■ An issue is moot when actions subsequent to the commencement of a lawsuit create an environment in which the Court can no longer give meaningful relief. *See Jews for Jesus, Inc. v. Hillsborough County Aviation Auth.,* 162 F.3d 627 (11th Cir. 1998); *Florida Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health and Rehab. Servs.,* 225 F.3d 1208 (11th Cir.2000). The issue of mootness is jurisdictional. *See North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). "By insisting that a plaintiff show a substantial likelihood of future injury, in the absence of declaratory or injunctive relief, courts further one of the purposes of the constitutional standing requirement—reserving limited judicial resources for individuals who face immediate, tangible harm absent the grant of declaratory or injunctive relief." *Bowen v. First Family Financial Servs., Inc.,* 233 F.3d, 1331, 1340 (11th Cir.2000).

CPL has shown that the allegedly wrongful behavior could not reasonably be expected to recur. *See Friends of the Earth v. Laidlaw Environmental Servs.,* 528 U.S. 167, 120 S.Ct. 693, 709, 145 L.Ed.2d 610 (2000). As the owner of the Ramada Limited, CPL has a record of accommodating the disabled and establish-

---

9. For example, the Court would rely upon an expert to identify whether an alteration which seems relatively small and affordable might, in fact, be quite serious and costly because it would require structural changes. The Court would further rely upon an expert to provide assurance that making a modification that remedies an ADA defect does not simultaneously cause violations of other building and fire safety codes.

ing policies to ensure ADA compliance. The evidence establishes that upon notification of Plaintiffs complaints, which came in the form of the instant suit, the hotel has made modifications which remedy the alleged barriers, to the extent such barriers ever existed and to the extent Plaintiffs have standing to allege their complaints. In most instances, Plaintiffs themselves have admitted that the accommodations made by Defendants are acceptable. Consequently, Plaintiffs' claims are moot, and injunctive relief is inappropriate.

### E. Conclusion

Plaintiffs have failed to make a prima facie case establishing that the Defendant's hotel contains barriers in violation of the ADA. Plaintiffs lack standing to complain about alleged barriers in room 120, and Mr. Brother lacks standing to bring this action. Mr. Ricci's report is based on misinformation and a lack of information, and it fails to demonstrate that the removal of alleged barriers is "readily achievable." In all, the alleged barriers Plaintiffs' complain of: a) fail as a matter of law because Plaintiffs' lack standing; b) fail as a matter of law because Plaintiffs have not made a prima facie case; c) assuming standing and a prima facie case, do not exist; d) assuming standing and a prima facie case, modifications are not required by the ADA; and e) assuming standing and a prima facie case, have been remedied and made compliant. Many of the alleged barriers suffer from more than one of these defects.

Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact. *See Miller v. Fenton,* 474 U.S. at 114–15, 106 S.Ct. 445. The Court retains jurisdiction for the purpose of awarding attorney's fees and costs. It is hereby:

**ORDERED AND ADJUDGED** that

Within five (5) days of the date of this **Order,** Defendant shall submit a proposed final judgment drafted in accordance with the findings of fact and conclusions of law set forth herein.