DISABILITY ADVOCATES AND COUNSELING GROUP, INC., and Steven Brother, Plaintiffs,

v.

Erotida BETANCOURT, Roger Garcia and Georgina Garcia d/b/a Central Plaza Shopping Center, 103200 Overseas Highway, Key Largo, Florida, Defendants.

No. 05–10064–CIV–KING.

United States District Court, S.D. Florida, Key West Division.

July 29, 2005.

William Nicholas Charouhis, Esq., William N. Charouhis & Associates, LLP, Miami, Counsel for Plaintiff.

Teresa Herrmann, Esq., Akerman Senterfitt, Orlando, Counsel for Defendant.

### OPINION AND ORDER OF DISMISSAL WITH PREJUDICE

JAMES LAWRENCE KING, District Judge.

Plaintiffs have filed two nearly identical complaints alleging the same cause of action against identical Defendants, identical property, identical Plaintiffs, seeking the precisely same injunctive relief. Plaintiffs' duplicate filing of the same case, before separate judges of the same court at the same time violates the universally condemned practice of judge shopping and the Local Rules of the Southern District of Florida 3.9A and D. This attempt to manipulate judicial assignment processes of this Court interferes with the orderly administration of justice and mandates dismissal with prejudice.

### I. *JUDGE SHOPPING*

### A. MANIPULATION OF JUDICIAL ASSIGNMENT SYSTEM DISRUPTION OF THE ORDERLY ADMINISTRATION OF JUSTICE

The attorney for Plaintiffs follows the same procedural tactic in every ADA case he has filed for Disability Advocates and Counseling Group, Inc. and Steven Brother in at least the last eighteen (18) months in this District. In each of the one hundred six (106) ADA cases he has filed for Plaintiffs, that have been dismissed by the original assigned judge for lack of standing, he has simply refiled as a new suit and gets a different Judge. Despite the clear mandate of Local Rule 3.9A, C and D, he remains silent about the prior dismissal of the same case. Although the cases are identical, he does not state on the Civil Cover Sheet the original judge's name, the docket number, or the name of defense attorneys. Further, he marks the case an "original proceeding" instead of its true designation "reinstated or reopened" case. Neither the Clerk or the second (new) judge randomly assigned to the case is aware of the prior consideration (and dismissal) by another judge of the Court. Counsel ignores the original dismissal of the same complaint and treats the original filing as though it never happened.

This practice is called "judge shopping" and Plaintiffs' reason for engaging in the practice is to get away from those judges who dismiss, generally *sua sponte*, Disability Advocates and Steven Brother for their

lack of standing. Plaintiffs' counsel, having filed several hundred of these ADA cases and having sustained multiple dismissals for lack of standing to sue, has to be aware that among Southern District Judges, there is divergence of opinion on the legal issue of Plaintiffs' standing to sue.

Some judges dismiss Plaintiffs' ADA cases, and others do not. It, obviously, is better for Plaintiffs to be assigned a judge who does not dismiss their case, than one who does (or has).

## B. DISMISSAL FOR LACK OF STANDING UNDER ARTICLE III

Determining the method used and motivation for the judge shopping activity being conducted by Disability Advocates, Steven Brother, and their counsel, required an analysis of the records maintained by the Clerk of this Court in the approximate 106 cases filed by these Plaintiffs and their counsel in the last 18 months. It was necessary to review the orders of dismissal, the grounds therefore, and then search the records to determine what next happened to the case. Did the dismissal orders end the case? Were the orders appealed? Were the cases refiled as "new" cases and assigned to a different judge? Did both parties ignore the dismissal order and continue with the case between themselves?

Review of the records of this Court of Plaintiffs' ADA filings answers these questions and reveals the *modus operandi* of Plaintiffs and their counsel.[1]

As a first step, it is necessary to define the several orders of dismissal (on the standing issue) being entered in dozens of these cases.

### 1. Dismissal With or Without Prejudice

#### a. The *Sua Sponte* Form Dismissal Order

A form order of dismissal has been entered in a number of Plaintiffs' cases by judges currently ruling against Plaintiffs on the standing issue. The one-paragraph form order states:

THIS CASE came before the Court upon *sua sponte* review. Disability Advocates and Counseling Group, Inc., does not have standing to bring this action under Title III of the Americans with Disabilities Act on behalf of its members. *Association for Disabled Americans, Inc. v. Concorde Gaming Corp.*, 158 F.Supp.2d 1353 (S.D.Fla. 2001); *Concerned Parents to Save Dreher Park v. City of W. Palm Beach*, 884 F.Supp. 487, 488 (S.D.Fla.1994). Absent a demonstration of standing, a plaintiff cannot satisfy the "case or controversy" requirement of Article III of the Constitution, and, thus, the Court lacks jurisdiction. It is:

ADJUDGED that this action is DISMISSED WITHOUT PREJUDICE.[2] All pending motions are DENIED AS MOOT, and this case is CLOSED.

---

1. The focus of this analysis is upon those cases that are being dismissed for Plaintiffs' lack of standing to sue. Dozens of Plaintiffs' cases proceed forward to ultimate conclusion without Defendants filing a motion to dismiss for lack of standing and without a ruling thereon until a final judgment is entered. When final judgment is signed for Plaintiff in all these settled cases, the Plaintiff is found to actually have standing to sue. (No Article III impediment to sue). This of course implicitly concedes that Plaintiffs Disability Advocates and Steven Brother have standing to sue and are entitled to injunctive relief, attorney's fees and costs if they prevail.

2. The order in this case dismissing for lack of standing is identical to the one above, except it is silent as to whether with or without prejudice. The order, identical in all other respects, simply dismisses the case and orders the Clerk to close it administratively.

Plaintiffs' counsel has received this same form order of dismissal on numerous occasions in the 106 cases he has filed in the last 18 months. Upon learning he is thrown out of court, he does not exercise his clients' legal right to amend (absolute, prior to answer), move to amend (after answer) or appeal when dismissal with prejudice. He simply refiles the same case and gets a different judge.

### b. Procedural History of Above Styled Case

The Judge, originally assigned this case, dismissed the corporate defendant on May 16, 2005 (11 days after filing) without response or motion by either Defendant.[3] This was followed by a second Order of Dismissal in which both the corporate and individual Plaintiff were dismissed for lack of standing.[4] The second Order of Dismissal was entered after the Defendants had answered and raised 19 affirmative defenses on May 31, 2005.[5] The promptness of entry of the second Order of Dismissal (6 days after answer) foreclosed Plaintiffs' time to respond to Defendant and no response was filed.[6]

After receiving the two Orders of Dismissal, one *sua sponte* and one without time for response, counsel immediately re-filed the same case as a new case, seeking a new assignment of a different judge.

The two Orders are silent as to whether the cases are dismissed *with* or *without* prejudice. Although the titles to both Orders contain the words (final and amended final) "order of dismissal," and the Clerk is ordered to administratively close the case, the finality of said Orders remains open to interpretation as to whether or not they were meant to be final bars to the filing of an amended complaint before the same Judge.

Certainly had the Orders contained the words "with" or "without" prejudice, the meaning would not be open to further interpretation. If the words "without prejudice" were used, the dismissed Plaintiffs would know that they had the right to cure the perceived defect (and dismissal) by filing an amended complaint before the same Judge.

Conversely, if the dismissal was with prejudice, it could, since it then would have the requisite degree of certainty and finality, be appealed. Either way, there would be no need to involve another judge or another division of court on the same case.

Four other judges of this Court *sua sponte* dismissed this same Plaintiff without prejudice.[7] The three Orders are

---

**3.** *Disability Advocates and Counseling Group, Inc. v. Betancourt,* No. 05–60740–CIV (S.D.Fla. May 16, 2005) (DE # 5) (Final Order of Dismissal).

**4.** *Disability Advocates and Counseling Group, Inc. v. Betancourt,* No. 05–60740–CIV (S.D. Fla. June 7, 2005) (DE # 10) (Amended Final Order of Dismissal).

**5.** *Disability Advocates and Counseling Group, Inc. v. Betancourt,* No. 05–60740–CIV, 2005 WL 1501850 (S.D.Fla. May 31, 2005) (DE # 8).

**6.** The Federal Rules of Civil Procedure do not set time limits on responses to affirmative defenses but a defense contesting standing could be treated as a motion to dismiss, which Fed.R.Civ.P. 6(a) allows response in 17 days.

**7.** *Disability Advocates and Counseling Group, Inc. v. Vasconia Investment Corporation,* No. 04–22883–CIV, 2004 WL 2982388 (S.D. Fla. April 29, 2005) (DE # 17); *Disability Advocates and Counseling Group, Inc. v. KFC U.S. Properties, Inc.,* No. 04–22615–CIV (S.D.Fla. May 5, 2005) (DE # 27); *Disability Advocates and Counseling Group, Inc. v. G. Betancourt Trust,* No. 04–22879–CIV (S.D.Fla. March 11, 2005) (DE # 10); *Disability Advocates and Counseling Group, Inc. v. G. Betancourt Trust,* No. 05–20893–CIV (S.D. Fla. April 29, 2005) (DE # 7).

identical in wording dismissing the three cases upon *sua sponte* review for not the same reasons but in the identical language. The four Orders appear to be "form" orders, in current use by several Southern District Judges, when dealing with ADA cases involving these particular Plaintiffs. The only difference is that the dismissal order by the original assigned judge in this case (and two other judges) is the silence as to "with or without" prejudice.

Plaintiffs clearly had the right to file an amended complaint, addressing the Judge's concerns over standing, to either or both of these orders. Without making any attempt to amend, on June 16, 2005, approximately nine (9) days after the assigned judge's second dismissal order (again silent as to with or without prejudice), Plaintiffs' attorney went "judge shopping." He filed the same case again with the Clerk of Court, obtained a new case number and a new judge. The new filing was substantially identical to the one dismissed by the original judge, with the same ADA cause of action, the same plaintiffs, the same defendants, and the same property at issue.

### 2. Plaintiff Uses the Same Modus Operandi in this Case

In what appears to be an obvious attempt to avoid the case at bar being assigned back to the original judge, Plaintiffs' counsel, when filling out the Civil Cover Sheet, left Section VIII (regarding related cases) blank. Section VIII specifically requires counsel to tell the Court whether or not the same or a related action has previously been filed in this Court.[8] Since counsel left this section blank, the Clerk of Court could not know Plaintiff was refiling the same case the original assigned judge had already twice dismissed. Without knowing Plaintiffs' case had already been considered by a different Southern District Judge, and twice dismissed, the Clerk assigned the same case randomly to another judge. The same case has now been twice assigned to two different judges of the same court, a threat to the orderly administration of justice court policy and local rules of court seek to prevent.

This, of course, achieved the obviously desired result of getting the same case away from the judge who was ruling against Plaintiffs, to a different judge, with neither judge being the wiser.

Normally, a party aggrieved by dismissal without prejudice simply files an amended complaint and cures the perceived defect,[9] or appeals (if ultimately dismissed with prejudice) and seeks reversal in the Eleventh Circuit Court of Appeals.

Here Plaintiffs' counsel did neither. He simply went shopping for a different judge in the Southern District.

### C. IMPLEMENTATION OF MANIPULATION

To accomplish the plan to get a different Judge, all that had to be done was to ignore Local Rule 3.9A., C., and D,[10] and

---

**8.** This is a continuing obligation for Plaintiff and Defendant counsel to disclose this information S.D. Fla. L.R. 3.9D FN *infra* p. 1348.

**9.** In this case easy enough to do by adding as additional Plaintiffs other disabled members of the Plaintiff organization who had visited the Defendant's property and encountered ADA barriers to access.

**10.** S.D. Fla. L.R. 3.9A governing refiled actions was unanimously adopted March 15, 1988 by the Judges of the Southern District of Florida to insure that cases dismissed for technical rule violations (i.e. citizenship, standing, failure to obey court orders setting: discovery and motion practice deadlines; file pre-trial stipulations; file scheduling orders; file briefs; amended pleadings or follow all rules of court) would remain with the original assigned judge.

ORDER IN RE: Transfers of similar actions and proceedings, Southern District of Florida Administrative Order 88–30

refrain from stating on the Civil Cover Sheet (JS 44) that the identical case had already been dismissed by the original randomly assigned judge on May 16, 2005.

### 1. The Civil Cover Sheet JS44—Failure to Disclose

Plaintiffs' counsel actually had three opportunities to be forthright with the Court about refiling the same previously dismissed case.

The Civil Cover Sheet [11] requires the filing attorneys to state the following information: (1) the names and addresses of Defendant's counsel; (2) whether the case is reinstated or reopened; and (3) the name of the judge and number of prior related case.

Counsel left questions 1 and 3 blank.

Counsel inaccurately stated the new filing to be an "original proceeding" knowing the case to be nearly identical to the original case, thus a related case that was "reinstated or reopened" in response to that question on the Civil Cover Sheet.

"RULE 3.9 TRANSFER OF REFILED AND SIMILAR ACTIONS AND PROCEDURES

**A. Refiled.** Whenever an action or proceeding is terminated by entry of a notice or order of dismissal and is refiled without a substantial change in issue or parties, it shall be transferred to the Judge to whom the original was assigned.

**C. Similar.** Whenever an action or proceeding is filed in the Court which involves subject matter which is a material part of the subject matter of another action or proceeding then pending before this Court, or for other reasons the disposition thereof would appear to entail the unnecessary duplication of judicial labor if heard by a different Judge, the Judges involved shall determine whether the newly filed action or proceeding shall be transferred to the Judge to whom the earlier filed action or proceeding is assigned.

**D. Notice to Court.** It shall be the continuing duty of the Clerk and of the attorneys of record in every action or proceeding to bring promptly to the attention of the Court and opposing counsel the existence of other actions or proceedings as described in paragraphs A, B, and C hereof, as well as the existence of any similar actions or proceedings then pending before another court or administrative agency. Such notice shall be given by filing with the Court and serving on counsel a "Notice of Pendency of Other Actions," containing a list and description thereof sufficient for identification."

Revised Rules were adopted February 15, 1993 without any change (except number) of this Rule.

11. JS–44 provides in part:

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. **(a) Plaintiffs–Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant.

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, notice in this section "(see attachment)".

V. **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Reinstated or Reopened. (4) *Check this box for cases reinstated or reopened in the district court.*

VII. **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket number and the corresponding judges names for such cases.

With respect to leaving blank the name of Defendant's counsel Teresa Herrmann, Esq. of the Akerman Senterfitt law firm, a fact known to Plaintiff from the prior same case filing, there is no explanation, except that to have done so would have alerted the Clerk and the second judge to the attempted judge shopping.

The same reasoning applies to leaving blank the space for the Judge's name and the docket number of the original case dismissed approximately three (3) weeks earlier.

### 2. Discovery of Plaintiffs' Judge Shopping

Plaintiffs' Complaint was filed on June 16, 2005 in the above-styled case. On June 17, 2005, the Court ordered Plaintiffs' counsel to file a certificate listing any prior filings under the ADA against this same property. Until ordered to do so, Mr. Charouhis had not advised the Clerk of Court of the prior case dismissed by the original assigned Judge.

There have been cases in this District where the same defendant property is sued a second, and even a third, time for the same violations of ADA. The first and second cases were settled when Defendant agreed to removal of the existing barriers and final permanent injunction against de-fendant was entered by two different Judges in two prior suits. The records of these cases reflect that after Plaintiff's counsel was paid a substantial fee the case languished with no effort to enforce the injunction or remove the barriers. The Defendant property owner and his lawyer seeing Plaintiff's sudden lack of interest in barrier removal did little to comply with the declaratory decree and Court order. The Defendant saved the cost of renova-tion to bring the property in compliance with the ADA and is probably the explana-tion for Defense counsel not complaining when his client (property owner) kept get-ting sued for the same violations.

Since none of the lawyers brought the failure of the parties to obey the orders to anyone's attention, the Judges were un-aware. A few months or years later, an-other ADA association sues the same De-fendants and same property, again for the same barrier violations, but before a differ-ent (third) Judge. The (new) Judge is, of course, not informed of the prior suits, prior injunction order or failure to remove the same barriers. As a result of this questionable practice the undersigned Judge requires that the plaintiff's attorney in all ADA cases file a certificate of coun-sel stating whether or not there has ever been any prior filings against the parties or property at issue in the most recently filed case.[12]

---

12. *Loose v. Rewards Hotel* (Case No. 05–10002–CIV–KING); *Association for Disabled Americans v. Bella's Fine Dining* (Case No. 05–10015–CIV–KING); *Association for Dis-abled Americans v. Inter–Ocean Holdings* (Case No. 05–10021–CIV–KING); *Disability Advocates v. Anchorage Resort* (Case No. 05–10024–CIV–KING); *Disability Advocates v. OPM Collectors, LLC* (Case No. 05–10028–CIV–KING); *Disability Advocates v. Sante* (Case No. 05–10038–CIV–KING); *Disability Advocates v. Erotida Betancourt* (Case No. 05–10054–CIV–KING); *Disability Advocates v. Clewis* (Case No. 05–20190–CIV–KING); *Dis-ability Advocates v. Trial Plaza Association* (Case No. 05–20312–CIV–KING); *Piper v. Sa-bal Palm* (Case No. 05–20510–CIV–KING); *Piper v. Sir Investments* (Case No. 05–20512–CIV–KING); *Disability Advocates v. Belgrano Properties* (Case No. 05–20607–CIV–KING); *Disability Advocates v. Eureka Plaza* (Case No. 05–20721–CIV–KING); *Disability Advocates v. BBB Quail Roost* (Case No. 05–20746–CIV–KING); *Martinez v. Tessaromatis* (Case No. 05–21050–CIV–KING); *Disability Advocates v. Time Enterprises* (Case No. 05–21060–CIV–KING); *Disability Advocates v. Flagler Shop-ping* (Case No. 05–21298–CIV–KING); and *Martinez v. Food Giant* (Case No. 05–21661–CIV–KING).

Judge Moreno and Judge Dimitrouleas en-ter similar orders and make the same require-ment of Plaintiff's counsel, in ADA cases. *See Disability Advocates v. Georgina Betancourt*

### a. Certificate of Counsel

After receiving the Court's Order, Plaintiffs' counsel on June 21, 2005, responded and filed a Certificate regarding prior filings. It reads in pertinent part:

1. These same Plaintiffs filed a similar action against the same three defendants under case no. 05–60740–CIV–COOKE, regarding the same property which is the subject of this action. On May 16, 2005 and June 7, 2005 Judge Cooke, due to what she believed was a pleading deficiency regarding standing, sua sponte, and without providing Plaintiffs the benefit of briefing the issue or the opportunity to file an amended pleading, entered orders dismissing the prior case. That prior case was dismissed before anything of substance happened therein (other than the Defendants filing their answer and affirmative defenses).

2. Because of the prior dismissal, and because an opportunity to cure the alleged deficiencies were not permitted in the prior action, the Plaintiffs revised the purported deficiencies and filed this new matter.

3. That related action (by and against the same parties) are the only ADA cases that have been brought against either the defendants or the property.

The statements contained in counsel's Certificate are misleading. Both of Judge Cooke's orders simply stated "Final Order of Dismissal." Under well-established case law and rules, such a Dismissal has no restriction on Plaintiffs to file an amended complaint in the same case. It is only in those cases where the order states "Final Order of Dismissal with Prejudice" that Plaintiffs are prevented from amending as of right. Counsel further explained, the "prior case was dismissed before anything

of substance happened therein." In fact, Defendants had filed their answer and affirmative defenses on May 31 and the Defendant's pleadings were pending in the prior case where Plaintiffs filed again on June 17. Counsel's statement regarding "nothing of substance" conflicts with the record. Mr. Charouhis reasoned that "[b]ecause of the prior dismissal, and because an *opportunity to cure the alleged deficiencies were not permitted in the prior action,* (emphasis added) the Plaintiffs revised the purported deficiencies and filed this new matter." (Plaint. Cert. at ¶ 2.) This is an inaccurate statement, but it clearly establishes that Plaintiffs' counsel knew that his client had been ruled against in the prior case and establishes motive for wanting to shop for a new judge. The new filing (King case) is a refiling of the identical complaint from the original Judge Cooke complaint!

### 1) The 28 Added Words

The new filing is the identical 11–page complaint previously filed and dismissed before Judge Cooke with the exception of 28 words counsel added to elaborate more fully the already stated status of Steven Brother. The original complaint, with the 28 words underlined reads:

DACG and its members, *including Brother,* have suffered direct and indirect injury as a result of Defendant's actions or inaction ...," (Pl. Comp. at ¶ 3.) *"[i]n both his individual capacity* and in his capacity as a "tester," when Brother encounters illegal barriers to access, as he did here with respect to Defendants' premises, he engages those barriers to the extent he is able," (Pl. Comp. at ¶ 8.) "[o]*ne or more of DACG's* members, including Brother *(individually initially and subsequently as a "test-*

er"), has attempted to access and use all public areas of the subject *shopping/business center which is owned, leased and/or operated by Defendants,* but has been discriminated against and ..." (Pl. Comp. at ¶ 10.) Plaintiffs also alleged that "[d]efendants have discriminated against *Brother* and the DACG's members by, *including Brother,* by denying them access to, and ...." (Pl. Comp. at ¶ 19.)

Although the 28 new words added, nothing of any substance to change or modify the original complaint, it would have been nevertheless, ridiculously easy to have inserted the same 28 words in a pleading labeled "Amended Complaint" and filed it before the original assigned judge. These Plaintiffs could have done this at any time.[13]

This, of course, would not have accomplished Plaintiffs' emergingly clear purpose of manipulating the procedural rules of this Court for the fair, equal and random assignment of cases.

### 2) Refiling Second Case

According to paragraph two (2) of counsel's Certificate of prior filings, he states that the above-styled action is a "new matter." That statement is misleading and inaccurate. Correctly marked would have been "Reinstated or Reopened" case. The above-styled action is the identical case in which Judge Cooke dismissed on the merits less than nine (9) days before counsel filed this action with the Clerk of Court for the second time calling it an original "new" proceeding.[14]

■ Running to the Clerk's office to re-file a case already dismissed on the merits is impermissible as a means to avoid continuing with the Judge that previously dismissed the case by amending, or as a means to avoid appealing that dismissal to the Eleventh Circuit.[15]

### 3) Remaining Silent with Duty to Speak

■ In addition, the intentional leaving blank section VIII of the Civil Cover Sheet is a violation of the Local Rules of Southern District of Florida. It was not until this court specifically ordered counsel to disclose of any prior filings that the undersigned Judge learned of the previous ADA filing and dismissal.

Review of the official records maintained in the Office of the Clerk of Court for the Southern District of Florida reflects that Plaintiffs' counsel, Mr. William Charouhis has filed an extraordinary number of Title III Americans With Disabilities Act Complaints on behalf of Plaintiffs. These Plaintiffs, Disability Advocates and Coun-

---

**13.** An amended complaint could have been filed without leave of court at any time after the first *sua sponte* Order of Dismissal was entered and up until the time the answer was filed on May 23, 2005. Thereafter, an amended complaint would of had to be upon motion and leave of court.

**14.** Repeated filings of the same cases by the same parties for the same relief are not only a tremendous waste of judicial resources and tax dollars but it will result in a false and exaggerated report by the Clerk of this Court to the Administrative Office of U.S. Courts in Washington. Our case filings will appear to be much greater than they actually are for the Southern District of Florida.

**15.** Since Plaintiffs' case was dismissed on June 7, 2005, Plaintiffs would have until July 7, 2005 in which to file a proper appeal with the Eleventh Circuit. Plaintiff did not appeal timely but, pursuant to F.R.A.P. 4(a)(5), a District Court may grant an extension of time in which a party can file an appeal if: (i) a party moves no later than 30 days after the time prescribed by this rule 4(a) expires: and (ii) regardless of whether a motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause. Plaintiff may wish to pursue this avenue to appeal Judge Cooke's order (or this order) now that the case is dismissed with prejudice.

seling Group, Inc. and Steven Brother have filed 106 nearly identical complaints in the past 18 months (January 2004—July 2005) in this District. He has attained the distinction of being responsible for the commencement of probably more than half of all ADA cases filed in the Southern District of Florida in the past two years.[16]

The relevancy to this case of the foregoing data from the records of the Court, is to demonstrate the magnitude of the problem for the orderly assignment of cases, and the substantial disruption to the administration of justice when parties contrive to manipulate the random assignment of judges.

The vast majority of these cases are settled with an award (either by agreement of counsel or submission of the sole issue to a magistrate judge) of substantial attorney's fees and costs paid to Plaintiffs' counsel. Very few cases proceed to trial on the merits of whether or not barriers exist that must be removed or rectified. The sole issue is how much Plaintiffs' attorney is going to be paid for fees and costs.[17]

### 3. Judge Shopping by Plaintiffs Affecting Many Judges

The records of this Court reflect that the Plaintiffs and their counsel in this case are not engaging in a single isolated instance of judge shopping but, on the contrary; have successfully employed the same practice herein condemned to move a number of ADA cases filed by these Plaintiffs and their lawyer from one judge to another.

### a. Rusty Pelican Case—New Case Ignored Prior Dismissal with Prejudice

On June 16, 2004, the parties jointly voluntarily dismissed their case in *Association for Disabled for Americans, et al. v. Biscayne Bay Restaurant Corp. d/b/a The Rusty Pelican,* Case No. 04–20628–CIV. Rejecting the parties agreement and joint motion to dismiss without prejudice and for the court to retain jurisdiction for enforcement, the Judge dismissed with prejudice and denied the motion [18].

In spite of the fact that the case was dismissed *with prejudice,* three (3) months later, on September 16, 2004, Defendant's property (The Rusty Pelican) was sued for the second time within one (1) year; this time by Disability Advocates in *Disability Advocates, et al. v. Biscayne Bay Restaurant Corp. a/k/a The Rusty Pelican,* Case No. 04–22330–CIV.[19] Instead of the case being reassigned to the same Judge that had previously dismissed the action with prejudice only three (3) months earlier, the case was assigned to a new District Judge.

Plaintiff did not tell the second (new) Judge that the case could not be re-filed a second time since the same case had already been dismissed with prejudice in the first case. Nor did he tell the court it was the same case re-filed. As the case proceeded before the second Judge, neither party informed the new Judge of the pre-

---

**16.** See *Federal Court Management Statistics* 2004 Administrative Office of the United States Courts, p. 163, Item J.

**17.** See *supra* pp. 1344–45, and *infra* p. 1361 reflecting the filing of a 106 cases in the past 18 months by this Plaintiff and its counsel. The total ADA case filings in this District are 451 cases for the two years of 2003 and 2004 by *all* attorneys filing ADA cases.

**18.** The dismissal with prejudice was apparently because the parties had not filed a settlement agreement one (1) day after filing a joint notice of voluntary dismissal.

**19.** Association for Disabled Americans and Disability Advocates have different names and counsel but the same purpose and function. Rhonda Anderson filed the first Rusty Pelican case for the Association for Disabled Americans and William Charouhis the second.

vious case that was dismissed with prejudice, as was their duty under by S.D. Fla. L.R. 3.9D. This was a continuing obligation of both Plaintiff and Defendant. This silence, on the part of Defendant's counsel is particularly mysterious (suspicious) since his client could not be sued *at all,* if the original Judge's order of dismissal with prejudice meant what it said. All Defendant counsel had to do was simply tell the second Judge about the dismissal with prejudice, or seek a contempt order from the original Judge for violation of her order.

Approximately one (1) month later, Plaintiffs moved to voluntary dismiss the second action without prejudice. The new Judge, not knowing that the same case had been previously dismissed with prejudice by the first assigned Judge, granted the motion. This time dismissed the case was dismissed *without* prejudice. The same case, can now be filed for a third time.

If Plaintiffs follow the same procedure they have followed in the past, no one will know about the two prior dismissals, by two Judges on the same Court, one with prejudice—one without.

Plaintiff and Defendant got what they originally wanted from the first assigned judge—dismissed without prejudice—and the case clearly demonstrates the conflicting orders and procedural chaos resulting from the shuffling of Judges, now repeatedly occurring when counsel violate the assignment rules of court.

### b. Mayo Plaza Case—
**First Judge Assigned—Dismissed;**
**Second Judge Assigned—Transferred (Third Assignment)**
**Back to First Judge—Subject to Same Dismissal and**

### Fourth Assignment, Etc, Etc.

Plaintiff, Disability Advocates sued Mayo Plaza, Inc., for declaratory and injunctive relief (not damages) and attorney's fees, litigation expenses and costs, pursuant to 42 U.S.C. 12181, *et seq.*[20] The original randomly assigned Judge, upon *sua sponte* review, dismissed the case without prejudice, finding that Plaintiff Disability Advocates did not have standing to bring the action under Title III of the ADA on behalf of its members.

Ten (10) days later, counsel, (without amending or appealing) re-filed the identical case with the Clerk of Court. Plaintiffs' counsel left blank Section VIII of the Civil Cover Sheet (JS44), failing to state that the same case had been previously filed and dismissed in the Southern District of Florida. The Clerk gave this re-filed (same) complaint a new assignment number and Judge.[21]

The new (second) assigned Judge ordered Plaintiffs' counsel to submit a certificate describing any prior filings under the ADA.[22] Upon learning (from the certificate) of the repeated filing, the second Judge entered an Order of Transfer (DE # 7), finding that pursuant to S.D. Fla. L.R. 3.9A the action should be assigned back to the original assigned Judge instead of being subject to a new random assignment. The original Judge had already *sua sponte* dismissed once (no standing). If he does so again, remaining consistent in holding Plaintiff does not have standing to sue, the case will be assigned for a third time, to yet another Judge.

### c. Trust Case—
**First Judge Assigned—Dismissed;**
**Reassigned to Second Judge—Dismissed;**

---

**20.** Case No. 05–60476–CIV

**21.** Case No. 05–60708–CIV

**22.** See *supra,* pp. 1349–50. FN 12

**(Possible Third Assignment).**

On November 12, 2004, Plaintiff, Disability Advocates sued Georgina E. Betancourt Trust for declaratory and injunctive relief (no damages sought) and attorney's fees, litigation expenses and costs, pursuant to 42 U.S.C. 12181, *et seq.*[23] The first Judge, upon *sua sponte* review, dismissed the action, finding that Disability Advocates did not have standing to bring the action under Title III of the ADA on behalf of its members.

Nineteen (19) days later, counsel, without amending or appealing, filed the identical case with the Clerk of Court in the Southern District of Florida. Again, when filling out Section VIII of the Civil Cover Sheet (JS44) regarding related cases, Counsel left this section blank, failing to state that the same case had been previously filed and dismissed in the Southern District of Florida. The case was then assigned for a second time, to another Judge.[24]

On April 1, 2005, the new (second) assigned Judge ordered counsel to submit a certificate regarding any prior filings under the ADA. On April 6, 2005, Mr. Charouhis submitted his certificate of counsel informing the Court that no prior filings on the property at issue had been filed in the Southern District of Florida. On April 29, 2005, upon the Court's *sua sponte* review of the previous case filing under Case No. 04–22879–CIV, the Judge sanctioned Plaintiff and its counsel by entering a Final Order of Dismissal (DE # 7) based on Plaintiff's failure to disclose the previously filed action when ordered to do so. Leave is given to re-file denied motions "if appropriate", perhaps indicating case can be filed again.

**d. West Plaza Case—**
**First Judge Assigned—Dismissed;**
**Re-assigned to Second Judge;**
**Possible Re-assignment to Third Judge.**

On February 24, 2005, Plaintiff, Disability Advocates sued West Plaza Condominium Association Inc. for declaratory and injunctive relief (no damages sought) and attorney's fees, litigation expenses and costs, pursuant to 42 U.S.C. 12181, *et seq.*[25] The first Judge, upon *sua sponte* review, dismissed the case, finding that Disability Advocates did not have standing to bring the action under Title III of the ADA on behalf of its members.

Nine (9) days later, counsel again filed the identical case with the Clerk of Court in the Southern District of Florida without amending or appealing. Plaintiff's counsel left Section VIII of the Civil Cover Sheet (JS44) blank, failing to state that the same case had been previously filed and dismissed by another judge. The case was assigned to a new (second) Judge instead of the original assigned Judge.[26] As to date, the case remains pending before the second Judge who has *sua sponte* dismissed upon the same grounds as the first Judge. If this occurs, the case will presumably be re-assigned to a THIRD Judge.

## II. *CONFLICT OF OPINION IN SOUTHERN DISTRICT*

### A. FINAL JUDGMENTS HOLDING PLAINTIFFS HAVE STANDING

In those cases that proceed to final judgment by settlement between the parties, there is a court finding that organizational Plaintiffs like Disability Advocates and Ac-

---

**23.** The suit was randomly assigned Case No. 04–22879–CIV.

**24.** *Case No. 05–20893–CIV*

**25.** The original randomly assigned Judge, Case No. 05–20535–CIV.

**26.** *Case No. 05–20591–CIV.*

cess Now and Steven Brother have established their standing under Article III. In this District, of the Plaintiffs' cases reviewed, over seventy five (75) cases have been resolved in this fashion; resulting in Judgment (including substantial awards of attorneys' fees and costs) for Plaintiff associations.

## B. PRE TRIAL ORDERS HOLDING PLAINTIFFS HAVE STANDING

The undersigned has denied motions to dismiss based on associational lack of standing in *Disability Advocates v. Gould*, No. 04–22543–CIV (S.D.Fla. Feb. 8, 2005) (minutes of evidentiary hearing on standing), *Association for Disabled v. Key Largo Bay Beach*, No. 04–10081–CIV, 2004 WL 2663257 (S.D. Fla. filed Sept. 10, 2004) and in approximately 18 other ADA cases (see FN 12). All of these rulings, holding that the associations had standing to sue are unpublished, but demonstrate the split of Southern District authority.

Judge Lenard has recently held these same Plaintiffs "... have established standing to sue in the Amended Complaint, field May 9, 2005", on behalf of the organization. *Disability Advocates v. KDV, Inc.*, No. 05–20414–CIV (S.D. Fla. June 9, 2005) (DE # 20).

## C. SUA SPONTE DISMISSALS HOLDING PLAINTIFFS DO NOT HAVE STANDING TO SUE

Judges can, and frequently do, differ in their interpretation of the law. The published opinions in *Wein* and *Concerned Parents* rely upon the U.S. Supreme Court decisions in *Hunt* and *United Food* (*infra* p. 1355) in their careful analysis of organizational Article III standing by associations representing the disabled. Each of these district court opinions interpret whether or not Plaintiff association has satisfied the three prongs of the *Hunt* test and therefore has associational standing to bring their claims on behalf of their members. The opinions have differed in interpretation of the third prong of that test; namely, whether or not the relief requested (by the organization) requires the participation of the individual members in the lawsuit.

The other pre trial opinions by different divisions of court and different judges in the Southern District have, in general, based the decision of standing to sue on the *Hunt, United Food,* and *Concerned Parents* decisions.

### 1. Final Judgments After Trial

The four published opinions by judges of this Court ruling on Article III standing as part of the final decision were issued after final non jury trials with full consideration of the testimony of all witnesses for all parties ·in non-jury trials. The Plaintiffs, although different in name, were similar ADA organizations. Three of them, Judge Ryskamp, Judge Highsmith and Judge Martinez, decided, after full trials, that the Plaintiff organizations did not have standing to sue. *See Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 884 F.Supp. 487 (S.D.Fla. 1994); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.,* 158 F.Supp.2d 1353 (S.D.Fla.2001); *Steven Brother and Robert Short v. CPL Investments, Inc.,* 317 F.Supp.2d 1358 (S.D.Fla.2004).[27]

Judge Moore, in *Wein, Access Now, Inc. v. American Huts, Inc.,* 313 F.Supp.2d 1356 (S.D.Fla.2004), rejected Defendant restaurant's motion to dismiss the Plaintiff association for lack of standing to "bring claim on behalf. of its members" holding that Plaintiff did have prudential standing

---

**27.** As noted *infra* pp. 1361–63, these ADA adverse dismissal rulings at the District Court level are never appealed. The Eleventh Circuit Court of Appeals has never been presented,.or ruled upon the standing issue.

to seek declaratory judgment and injunctive relief, under the ADA, for removal of discriminatory barriers. To the extent that Plaintiff sought organizational standing to sue for *damages,* (i.e. compensatory, mental suffering, anguish, loss of dignity, or punitive damages) on behalf of any of its members the motion to dismiss was granted with leave to amend.

■ The clear holding of *Wein* is that Plaintiff organizations for the disabled (Access Now—Disability Advocates) meet the three prong test of *Hunt* and have standing to sue when no damages are sought, only declaratory and injunctive relief. These opinions are further analyzed in this opinion *infra* pp. 1356–60.

Of the four published opinions rendered after trial, referred to above all, except one, awarded declaratory decree, injunctive relief and attorney's fees and costs to the plaintiff organization involved in those cases. This poses a legal issue as to whether or not a ruling awarding relief to a party can be granted if the Court concludes that the party does not have standing to sue. A ruling of no jurisdiction under Article III obviates the necessity for proceeding further or a trial.

Generally, in these ADA cases, defense counsel do not raise by separate written motion to dismiss the issue of standing. Since it rarely is brought to the Court's attention prior to final argument at trial, a division of opinion and resulting split of authority has developed.

## D. FINAL JUDGMENTS GRANTING INJUNCTIVE RELIEF, IMPLICITLY HOLDING PLAINTIFFS HAVE STANDING

The remaining Southern District Judges who have not dismissed Plaintiffs' cases for lack of standing have implicitly found Article III standing in over 75 cases by entry of final judgments for Plaintiffs. Every Final Judgment granting Plaintiffs' injunctive relief, attorney's fees and costs is a legal ruling that the Plaintiffs are proper Plaintiffs with lawful standing to sue and receive judgment. This fact alone, creates substantial split authority in this District over Plaintiffs' standing to sue. From Plaintiffs' perspective, it is better to get a judge on the side of the split of authority that has already decided for you, on standing, than one who has decided against.

Among the group of judges dismissing for lack of standing, a conflict arises between their orders of dismissal of Plaintiffs' cases and other final judgments the same judges have entered in other (different) Plaintiffs' cases wherein it was held that Plaintiffs had standing to sue, obtain injunctive relief, and be paid attorney's fees and costs.

The *Wein* decision recognizes that the third prong of the test has been determined by the United States Supreme Court in *Hunt* to be prudential and not a constitutional requirement. In the analysis of this opinion where only declaratory, injunctive (or some other form of prospective relief) is sought, as claims on behalf of an organization for monetary damages, Plaintiff and organizations like it have Article III standing to sue.

### 1. Wein v. American Huts, Inc.

The division of opinion by Judges of the Southern District and the reasons supporting Plaintiffs' assertion of standing to sue under Article III are clearly stated in *Wein, Access Now, Inc.*[28] *v. American Huts, Inc.,* 313 F.Supp.2d 1356 (S.D.Fla.

---

**28.** Access Now, Inc. has a member composition, purpose, and organization similar to Disability Advocates for standing to sue to remove barriers under ADA. The two organizations are carbon copies of each other.

2004). In affirming the right of *Access Now* to bring claims on behalf of its members in an ADA case seeking declaratory and injunctive relief Judge Moore said:

> If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case. To answer the question of standing, this Court must determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise." *See Warth*, 422 U.S. at 498, 95 S.Ct. 2197, 45 L.Ed.2d 343. The threshold question for these constitutional limitations is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* at 498–99, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. A plaintiff invoking federal jurisdiction must allege "a personal stake in the outcome of the controversy." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Pursuant to Article III of the U.S. Constitution, this Court's judicial power exists "only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Id.* at 499, 95 S.Ct. 2197, 45 L.Ed.2d 343.

\* \* \* \* \* \*

An association has standing to sue on behalf of its members when: (1) at least one of its members has standing to sue in his own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 552–53, 116 S.Ct. 1529, 134 L.Ed.2d 758

(1996) (citing *Hunt v. Wash. State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

\* \* \* \* \* \*

The Supreme Court has held that the third prong of the test set forth in *Hunt* is a prudential, not a constitutional, requirement. *United Food,* 517 U.S. at 557, 116 S.Ct. 1529, 134 L.Ed.2d 758. This prong "is not normally necessary when an association seeks prospective or injunctive relief for its members..." *Hunt* indicates, however, "that such participation [of an association's members] would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue." *See id.* at 545, 116 S.Ct. 1529, 134 L.Ed.2d 758 (citing *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434, 53 L.Ed.2d 383). The determination of "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *See Warth,* 422 U.S. at 515, 95 S.Ct. 2197, 45 L.Ed.2d 343.

The *Wein* opinion makes clear an ADA organizations' legal standing to sue when it does not seek damages for individual members (only injunctive relief).

Plaintiff *Access Now* cites two orders and one report and recommendation from this District to support its argument that it has standing to bring claims on behalf of its members. See Response at 7–8 (citing *Access Now, Inc. v. Yas-*

*har,* 00–CV–2224 (DE # 23) (ordered Mar. 27, 2001); *Access for the Disabled, Inc. v. Splitting Ates, Inc.,* 01–CV–7209 (DE # 17) (ordered Nov. 28, 2001); *Access Now, Inc. v. O'Neil Theaters, Inc.,* 99–CV–7160 (DE # 32) (issued Apr. 26, 2000)). In all three of these actions, the court determined that the "association" plaintiffs had satisfied the three prongs of the *Hunt* test and therefore had associational standing to bring their claims on behalf of their members. This Court notes, however, that the plaintiffs in each of these actions were seeking only declaratory and/or injunctive relief, not damages.

*Id.* at 1361.

### 2. Concerned Parents v. City of West Palm Beach

The other published opinion analyzing organizational standing to sue under the Americans with Disabilities Act is the final judgment, entered after a full trial on the merits in *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 884 F.Supp. 487 (S.D.Fla.1994). That case, like the case at bar, sought only injunctive relief on behalf of twelve (12) individual plaintiffs who "... were participants in the City's Special Population Program for persons with disabilities at Dreher Park. Each Plaintiff has a specific disability that makes him or her unable or unsuited to participate in the recreational programming offered by the City to the general public." *See Id.* at 489.

In granting the City's motion (after trial) to dismiss Plaintiff Concerned Parents,[29] the Court relied upon *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) and said:

---

**29.** Plaintiff did not appeal.

**30.** See "Form Order of Dismissal" being entered in Southern District citing *Concerned*

The Complaint alleged that Concerned Parents is an "association of over fifty parents and volunteers organized to protect the rights of people with disabilities to recreational opportunities in the City of West Palm Beach." They were organized on July 28, 1993, "because of the community's concern that services for disabled persons would be eliminated" by the City in the process of cutting the City's budget.

Concerned Parents cannot establish associational or representational standing to sue on behalf of its members under the three-prong analysis set forth in *Hunt v. Washington State Apple Advertising Comm.,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See Concerned Parents to Save Dreher Park,* 884 F.Supp. at 488

Several Southern District Judges have cited the *Concerned Parents* opinion as authority for holding Disability Advocates (and other similar organizations) do not have the essential Constitutional standing to bring these types of ADA complaints.[30] These rulings are in conflict with the *Wein* opinion, *supra,* holding that where declaratory and injunctive relief only is sought (not damages) that the three prongs of the *Hunt* case are met and the ADA organizations here involved have standing to sue.

This Court is of the opinion that there are several important distinguishing factors between the two opinions, that render the Judge Moore's decision in *Wein* the correct legal authority where an organization, like the one involved in the case at bar, is seeking only declaratory and injunctive relief.

The *Concerned Parents* opinion was rendered after a full trial on the merits, where

---

*Parents* and *Concorde Gaming Corporation, supra* p. 1345.

the organization had an opportunity to present the testimony of its individual members. In the case at bar and those cases that have been dismissed upon the form order citing *Concerned Parents*, dismissal has been *sua sponte* shortly after the complaint is filed and prior to any motion to dismiss testing the sufficiency of the complaint and the allegations, which must be taken as true, of the standing of the Plaintiff organizations.

Plaintiffs do not seek damages in this case. They seek only declaratory and injunctive relief and therefore would appear to meet the requirements of *Hunt* for associational standing to sue in ADA cases. More importantly, all of the ADA cases filed by Plaintiffs in the Southern District of Florida in the past several years have sought only declaratory and injunctive relief, *not damages*. The Court is unaware from its review of a substantial number of case filings in the Southern District of *any* case in which anything other than declaratory and injunctive relief was sought.[31]

### 3. Hunt v. Washington State

The leading Supreme Court case articulating a test for Associational Standing, *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), is cited in *Concerned Parents*. *Hunt* holds that an association has standing to bring suit on behalf of its members when:

(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit

*Id.* at 343, 97 S.Ct. 2434. *Hunt* also held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members. *Id.* at 342–43, 97 S.Ct. 2434.

### 4. United Food v. Brown

In *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), the Supreme Court held that while the first two prongs of *Hunt* are grounded in Article III of the Constitution as an element of the case or controversy requirement, the third prong is prudential in nature. The Court noted that "prudential limitations are rules of 'judicial self-governance' that 'Congress may remove ... by statute.'" *Id.* at 558, 116 S.Ct. 1529.

In *Wein*, 313 F.Supp.2d at 1360, Judge Moore relied on *Hunt* and *United Food and Commercial Workers* in finding that Access Now, Inc. had standing. "Access Now has sufficiently alleged facts to establish that it has standing to pursue declara-

---

**31.** None of the cases *sua sponte* dismissed (filed by Disability Advocates or the Association for Disabled Americans) have sought damages (only injunctive relief). The prayers for relief in all these complaints are the same:

WHEREFORE, Plaintiffs respectfully request that the Court find that the Defendants have been and continue to be in violation of the ADA and discriminating against Plaintiffs, issue a permanent injunction enjoining Defendants from continuing their

discriminatory practices, ordering Defendants to alter the subject premises as appropriate to comply with the ADA, closing the subject premises until the requisite modifications are completed, awarding Plaintiffs their attorneys' fees, costs and litigation expenses incurred in this action, and retaining jurisdiction over this action to assure Defendants' subsequent compliance with the ADA and protect against similar subsequent discrimination by Defendants.

tory and injunctive relief on behalf of its members." *Id.* at 1360–61. He held Plaintiff did not have organization standing only in those cases where *damages were sought.*

## E. RELIANCE ON CONCERNED PARENTS AND CONCORDE

### 1. Concerned Parents

*Concerned Parents,* 884 F.Supp. 487, the seminal case on denial of standing has been the case all other Southern District Judges have relied upon as authority for involuntary *sua sponte* dismissal of ADA case filings. (See form order *supra* p. 1345) As stated above, the case held that Concerned Parents could not establish associational standing to sue on behalf of its members under the three-prong *Hunt* test because any finding of an ADA violation requires proof as to each individual claimant. *Id.* at 488. Additionally, it held that "the relief afforded to each claimant would require an individualized assessment of which measures the City must take in order to comply with the ADA on a case-by-case basis." *Id.* at 489. The opinion states:

> The plaintiff cannot, however, shoehorn an unknown number of supposed, but unknown, victims into their cause of action by the mechanism of associational standing. *See, e.g. Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985) ("[a]ssociational standing is properly denied where, as here, the need for 'individualized proof,' [citation to *Hunt* omitted], so pervades the claim that the furtherance of the members' interests requires individual representation"). The City's motion to dismissed Concerned Parents and to strike Concerned Parents as a plaintiff is therefore

granted. *Concerned Parents,* 884 F.Supp. at 489

### 2. Terre Du Lac

*Terre Du Lac* did not involve the Americans with Disabilities Act. The standing issue involved a property owners' association's suit against the developers of a subdivision, pursuant to the Land Sales Act for failing to fulfill promises to pave roads, complete the sewage system, and offer free access to country club amenities. *Terre Du Lac,* 772 F.2d at 469. The Eighth Circuit held the property owners' association failed the third prong of the *Hunt* standing test because of the type of relief available under the Land Sales Act. *Id.* at 471. The Land Sales Act, which provides for damages and specific performance remedies, differs from the Americans with Disabilities Act, which provides for injunctive relief. The *Terre Du Lac* Court cited an antitrust case for the proposition that in cases of " '*injunctive* relief, associational standing is not denied unless the association is an inappropriate representative for some reason.' " *Id.* (emphasis in original).

### 3. Concorde

In *Association for Disabled Americans, Inc. v. Concorde Gaming Corp.,* 158 F.Supp.2d 1353 (S.D.Fla.2001), the Judge, without discussion, relied on the *Concerned Parents* holding that "any finding of an ADA violation requires proof as to each individual claimant."

### 4. Betancourt

The first assigned Judge, in dismissing *Disability Advocates v. Betancourt,* (the above-styled action) on June 7, 2005 relied on the *Concerned Parents* opinion and the *Concorde Gaming* concurrence.[32] The

---

**32.** *Disability Advocates v. Betancourt,* No. 05–60740–CIV (S.D. Fla. June 7, 2005) (Amended    Final Order of Dismissal).

Court also cited to *Hunt, United Food and Commercial Workers,* and *Wein. Id.*

Additionally, the first assigned Judge ruled that Plaintiff Stephen Brother lacked individual standing to sue based on his status as a "tester." *Id.* Without Mr. Brother as a plaintiff, Disability Advocates fails the first prong of *Hunt,* namely that they no longer allege "at least one of [their] members has standing to sue in [his or her] own right." If Disability Advocates fails the first prong of the *Hunt* test, Plaintiffs lack Constitutional standing. If, however, the dismissal is based on the fact that Disability Advocates fails the third prong of *Hunt,* it is not a Constitutional standing issue but rather a prudential one. *See United Food,* 517 U.S. at 556, 116 S.Ct. 1529.

This analysis is presented for the sole purpose of demonstrating decisional differences among the Judges of this Court giving rise to a reason for lawyers for ADA organizations to seek assignment to a different judge.

It is not criticism of any colleagues or his or her legal opinion.[33]

## III. *NEVER APPEAL*

### A. PLAINTIFFS NEVER APPEAL *SUA SPONTE* DISMISSALS FOR LACK OF STANDING

Since the Plaintiff Disability Associates never appeals an adverse dismissal for lack of association standing to sue under Article III, the question of "why not?" comes to mind. Was the decision to forgo the normal appellate process part and parcel of plaintiff's judge shopping *modus operandi* to get away from those judges who consistently ruled against Disability Advocates? And, if so, what was the magnitude of the effect on the equal random judicial assignment process of the Southern District?

In the 106 cases reviewed, where a Southern District Judge ruled that Disability Advocates did not meet the standing requirements of the law, Plaintiffs, through the same counsel, followed the same tactical procedure of judge shopping. Plaintiffs did not seek to amend their standardized complaint. Plaintiffs did not appeal the adverse dismissal ruling it had sustained (2 exceptions *infra* p. 1362). Had Plaintiff appealed, the issue of lack of standing would have been decisively and finally determined with binding effect that all Southern District Judges would follow on the standing issue. Plaintiff simply treated the original filing as though it did not exist, filed the identical complaint and received a second random judicial assignment, and did not advise either the original judge or the succeeding judge of the existence of the prior (and dismissed) case.

With neither the Clerk nor either of the involved judges being any the wiser, judicial resources are duplicated and hence, wasted. Plaintiffs' tactical goal of getting away from those judges who have ruled against it, on the basis of lack of standing, is successful.

Since these adverse rulings, as a matter of routine procedure by Plaintiff Disability Advocates are either (a) not pursued at all,

---

**33.** Although this has given rise to a conflict of authority in the Southern District, the analysis and holding of the undersigned respecting the important issue of organizational standing to sue should never be misconstrued as any reflection upon the opinions of my fellow judges who may disagree with this analysis. I have the utmost respect for the men and women who serve as judges on the Southern District of Florida and only found it necessary to undertake the research and discuss the Southern District conflict of authority in order to rectify what I perceive to be a substantial abuse of the fair and random assignment of cases by certain Plaintiff and Defendant parties, and their counsel, practicing in the specialized field of Americans with Disabilities Act law.

or (b) abandoned, the Eleventh Circuit Court of Appeals has never had the opportunity to issue a definitive ruling. Had the circuit court been able to do so, it would eliminate the split of authority and divergent rulings by Southern District Judges on this issue.

### B. EXCEPTIONS—APPEALS ABANDONED

Review of the 106 cases Disability Advocates have filed reflect only two exceptions to the "no appeal" procedure. Plaintiffs' counsel abandoned his clients' appeal by not filing appellant briefs in *Brother v. CPL Investments, Inc.*, 317 F.Supp.2d 1358 (S.D.Fla.2004) (holding Steven Brother lacked standing). For this failure, the Steven Brother's appeal was dismissed by the Eleventh Circuit and it never had the opportunity of affirming or reversing either any of the rulings of the six Southern District Judges who dismissed Plaintiff for lack of standing, or the others who did not.

### 1. The Ramada Hotel Trial

Steven Brother and Robert Short sought declaratory and injunctive relief pursuant to 42 U.S.C. 12181, *et seq* for the removal of barriers he allegedly encountered in Defendant's hotel rooms. After a non-jury trial, the presiding Judge found that Plaintiffs did not have standing to complain about alleged barriers which were not related to their respective disabilities or of which they were unaware, when the complaint was filed. He further found that Mr. Brother's injuries were largely speculative and his claims that he intended to use the Ramada hotel in the future were not credible. *Brother v. CPL Invs., Inc., supra.*

Plaintiff Brother has the same Attorney in the Ramada case (*supra*) and this case now before the Court. Plaintiff's counsel (in both cases) appealed this critically important decision that his client, Steven Brother, did not have standing to sue.

The Ramada appeal was abandoned when plaintiff's counsel did not file a trial record or appellant brief. The appeal from that decision, which obviously had the potential, if affirmed, of barring future ADA filings by Steven Brother was dismissed by the Court of Appeals on September 15, 2004 for counsel's failure to perfect his appeal.

### 2. The $45,000 Sanction—The Second Appeal

Not only did Plaintiff's counsel abandon the first appeal on the merits of his client's case, but he also voluntarily dismissed the second appeal he took in the same case to the Eleventh Circuit. The second appeal was from an affirmance of the ruling by a Magistrate Judge, granting Defendant hotel's fees and costs.[34] The appealed order held counsel personally liable for the $45,000.00 attorneys' fees and costs in an order highly critical of Plaintiff's Counsel. Although Steven Brother and his counsel initially appealed this severe sanction (and professional condemnation), he subsequently voluntarily dismissed the appeal. *Brother, et al. v. CPL Investments, Inc.*, No. 05–10383–FF (11th Cir. Feb. 17, 2005).

Since that division of Southern District Court is also one that has entered the form *sua sponte* Dismissal Order (*supra* p. 1345), Plaintiff's motivation to escape the assignment to that particular Judge (groundless though it may be) is sharply enhanced. The adverse decisions of (a) loss of standing to sue, and (b) personal judgment against counsel are powerful motivation for Brother and his counsel to Judge shop every time they are assigned to the Judge in the Ramada hotel case.

---

**34.** *Brother, et al. v. CPL Investments, Inc.* (Case No. 02–23680–CIV).

### 3. Why no Appeal from Dismissals Either (a) *Sua Sponte,* or (b) Trial?

Although certainly there are other reasons for not appealing, dismissing an appeal or abandoning, after filing, at least one reasonable interpretation as to why neither these Plaintiffs nor their counsel in this or any other case brought by a plaintiff organization representing the disabled in these ADA cases in this District do not appeal is that Plaintiff and counsel do not want the Eleventh Circuit to consider the issue of whether or not Plaintiff and Mr. Brother (or any other group) have standing to sue under the ADA. An adverse ruling by the Eleventh Circuit on the organizational and individual standing issue would have a potentially disastrous impact on Plaintiff and their counsel in their ability to continue filing ADA suits.

The Court therefore concludes that Plaintiffs, by never appealing an adverse standing ruling, gain an advantage by getting a judicial assignment of their case to a Judge who has previously upheld the standing of Disability Advocates (and similar groups, ie Association for Disabled Americans, etc.). The "no appeal" policy of Plaintiff is an integral part of the plan to judge shop, resulting in disruption of the orderly administration of justice.

### C. MOTIVE

It would seem, therefore, that the motive of Plaintiffs and their counsel is clear. ADA cases randomly assigned to any Southern District Judge who had previously ruled against Plaintiffs' organizations on standing are "judge shopped." The "no appeal" rule applied in all *sua sponte* dismissals or adverse decisions.

### IV. CIRCUIT CONDEMNATION OF JUDGE SHOPPING

In a strongly worded opinion, emphatically condemning attempted manipulation of the random assignment system for the purpose of judge shopping, the Eleventh Circuit Court of Appeals in *In re Bell-South Corp.,* 334 F.3d 941 (11th Cir.2003) quoted with approval *Grievance Administrator v. Fried,* 456 Mich. 234, 570 N.W.2d 262, 267 (1997).

> Although only a few courts have addressed the issue, it has been said that "attempts to manipulate the random case assignment process are subject to universal condemnation." *United States v. Phillips,* 59 F.Supp.2d 1178, 1180 (D.Utah 1999) (collecting cases and scholarly literature).

*In re Bellsouth,* 334 F.3d at 958.

> The Court went on to say:

> We have no difficulty concluding that a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice. Every court considering attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice. In *McCuin [v. Texas Power & Light Co.],* the Fifth Circuit held that permitting such manipulation would bring "the judicial system itself into disrepute" and "would permit unscrupulous litigants and lawyers to thwart our system of judicial administration." 714 F.2d [1255] at 1265 [(5th Cir.1983)]. This court in *Robinson [v. Boeing Co.,* 79 F.3d 1053 (11th Cir.1996)], *supra,* expressed the obvious concern with respect to the effects of such manipulation and judge-shopping on the proper administration of justice. The Second Circuit's decision in [*In re*] *FCC, supra,* implicitly recognized that such manipulation is disruptive of the orderly administration of justice; the court used its inherent power to disqualify a lawyer in order to preserve "the neutral and random assignment of judges to

cases." 208 F.3d [137] at 139 [(2d Cir. 2000)]. Similarly, the Supreme Court of Michigan, in [*Grievance Adm'r v.*] *Fried, supra,* emphatically condemned such manipulation: "It is prejudicial to the administration of justice, because it is an undue interference with the proper assignment of cases." [456 Mich. 234], 570 N.W.2d [262] at 267 (1997). *See also Standing Committee on Discipline v. Yagman,* 55 F.3d 1430, 1443 (9th Cir.1995) (stating in dictum that "[j]udge-shopping doubtless disrupts the proper functioning of the judicial system and may be disciplined."); *United States v. Phillips,* 59 F.Supp.2d 1178, 1180 (D.Utah 1999) (collecting cases and scholarly literature indicating that manipulation of the random case assignment process is universally condemned as a disruption of the integrity of the judicial system that would undermine public confidence in the assignment process).

*Id.* at 959–60.

Although dealing with criminal case assignments, the second assigned judge in a strongly worded opinion condemning the evils of judge-shopping and the reasons therefore, in *United States v. Phillips,* 59 F.Supp.2d 1178, 1180 (D.Utah 1999) said:

> This random case assignment system, one expressly approved by the judges of this court in accordance with the statutory command found in 28 U.S.C. § 137, has been well understood by both the bench and the bar to "prevent judge shopping by any party, thereby enhancing public confidence in the assignment process." *United States v. Mavroules,* 798 F.Supp. 61, 61 (D.Mass.1992). Indeed, it has been noted by at least one commentator that "random assignment protects the integrity of the judicial system by leaving the pairing of cases and judges to chance." Christine S. Studzinski, *The Law of the Lawyer,* 44 No. 4 PRAC.LAW. 7 (June 1998). Courts

have also recognized the role that random assignment procedures play in promoting fairness and impartiality and in reducing the dangers of favoritism and bias. *See State v. Sprint Comms. Co.,* 699 So.2d 1058, 1063 (La.1997). For this reason, attempts to manipulate the random case assignment process are subject to universal condemnation. *See United States v. Conforte,* 457 F.Supp. 641, 652 (D.Nev.1978), *aff'd,* 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980); *see also* Jonathan L. Entin, *The Sign of "The Four": Judicial Assignment and the Rule of Law,* 68 MISS.L.J. 369 (1998) (noting that "[m]anipulation of judicial assignments can deprive litigants of their right to a fair hearing and contravene basic principles of due process"); Kimberly Jade Norwood, *Shopping for Venue: The Need for More Limits on Choice,* 50 U. MIAMI L.REV. 267, 300 (1996) (stating that because judge-shopping "would invite public skepticism of the ability to receive justice in our court system and would cheapen the judicial process ... judge shopping is still 'universally condemned' by the courts") (citing cases).

In an analogous decision the Sixth Circuit decision *In re Fieger,* 1999 WL 717991, 1999 U.S.App. LEXIS 22435 (6th Cir. Sept. 10, 1999), considered a lawyer's behavior in failing to properly fill out the Civil Cover Sheet on 13 complaints he had filed for declaratory and injunctive relief in federal district court. The cases all challenged the constitutionality of the same provisions of Michigan common law. *Id.* at *1, 1999 U.S.App. LEXIS 22435, at *3. The Court, in approving the fine and sanctions imposed by the district court condemned Fieger's conduct in filing the 13 actions, failing to advise the Clerk that they were related, and then dismissing 12 of the pending cases so as to ensure as-

signment to a judge of his choice. *Id.* at *4, 1999 U.S.App. LEXIS 22435, at *11–12. *See also* Kimberly Jade Norwood, *Shopping for Venue: The Need for More Limits on Choice*, 50 U. MIAMI L.REV. 267, 300 (1996).

Although factually different, in that the Court *In Re BellSouth Corp.*, suspected judge-shopping through a device of forcing disqualification of judges by hiring their relatives into the case as attorneys, the language, at page 961 is instructive.

> A party should not be allowed to "test the waters" with a judge and, having found preliminary rulings not to its liking, stage a conflict so as to try its luck with a replacement judge." *See Bivens Gardens Office Bldg. v. Barnett Banks,* 140 F.3d 898, 913 (11th Cir.1998) (holding that party that strategically withheld motion to recuse until after receiving unfavorable outcome at trial would not be allowed to raise it for the first time in conjunction with motion for post-judgment relief).

*In Re Bellsouth Corp.,* 334 F.3d at 961.

In this case, Plaintiff and its counsel had no need to "test the waters" since they knew that Judge Martinez and Magistrate Judge Klein had already entered adverse final orders in *Brother v. CPL Investments, Inc.,* 317 F.Supp.2d 1358 (S.D.Fla. 2004) on Plaintiffs' lack of standing and counsel's conduct, warranting a $45,000 sanction.

## V. CONCLUSION

By passage of the Americans with Disabilities Act,[35] Congress intended to make the lives of millions of disabled Americans a happier and more productive existence by giving them the same equal access to public services as that enjoyed by all Americans. Its purpose was to enable disabled persons, who historically had been discriminated against by construction and maintenance of "architectural, transportation and communication barriers" to enforce, by suit if necessary, the removal of those barriers. When the barriers were thus removed, all disabled persons would benefit by being able to enjoy access to public buildings. Litigation brought under the Act to remove the public barriers and make the property and services available to all disabled, if carried out in the manner of which Congress anticipated, would in time hopefully remove all public barriers.

I respectfully differ from those of my Southern District colleagues who have entered *sua sponte* dismissals in ADA cases filed by Plaintiff Disability Advocates on the basis that the factual allegations of the near identical complaints filed in hundreds of cases in this Court do not state a case and controversy under Article III and that they are therefore precluded from suing since. In my judgment, these complaints, and those filed by other similar associations of like membership and purpose, state sufficient facts which, taken in the light most favorable to the Plaintiff, withstand motions to dismiss for lack of standing. At trial, the Plaintiff organizations will be put to their burden of proof to prove that they qualify as protected organizations or individuals under the Ameri-

---

**35.** 42 U.S.C. § 12101(b)(1)(2) and (4).
Congress explicitly stated that the purpose of the ADA was to:
i.  provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
ii. provide clear, strong, consistent, enforceable standards addressing discrimi-

nation against individuals with disabilities; and
iii. invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

cans with Disabilities Act seeking only declaratory and injunctive relief.

Other than adding to the split of authority, with differing opinions proliferating the hundreds of cases filed under ADA in this District, the foregoing paragraph adds little. Hopefully this final order of dismissal, as hereinafter set forth, may be one of those "exceptional" cases that Plaintiffs will decide to take to the Court of Appeals. If so, there may be some finality on this important legal issue.

The acts described in this opinion by attorney for plaintiffs on behalf of his clients Disability Advocates and Counseling Group, Inc. and Steven Brother, to interfere with the judicial assignment process and manipulate the random assignment of judges, has been disruptive to the orderly administration of justice. The repeated refilings of the same case, the same parties, the same issues and against the same property without disclosure of an adverse ruling in the same previously filed case for the purpose of being assigned to a judge more favorable to Plaintiffs' position is judge shopping. This cannot be countenanced.

The magnitude and scope of acts by Plaintiffs and their counsel, as described in the foregoing opinion have seriously interfered with the orderly processing of the resolution of the important issues of fact and law that normally would have been resolved with clarity and finality, had this mass reshuffling of judicial assignments not occurred. It is therefore,

ORDERED, ADJUDGED and DECREED that the above-styled case be, and the same is hereby, **DISMISSED WITH PREJUDICE,** as a sanction for violation of the rules, policies and court decisions described herein.[36]

---

**36.** The Honorable Federico A. Moreno entered a Final Order of Dismissal in *Disability Advocates and Counseling Group, Inc. v. Georgina E. Betancourt Trust,* No. 05–20893–CIV (S.D.Fla. Apr. 20, 2005) (Final Order of Dismissal) against the same Plaintiffs (Disability Advocates and Counseling Group, Inc. and Steven Brother) and their counsel Mr. Charouhis on April 28, 2005 as a sanction for stating to the Court that "...no such action had been brought against either the defen-

dant(s) or the property." Contrary to the Plaintiff's verified response, however, counsel for Plaintiff himself recently brought suit on behalf of one of the Plaintiffs in this action, Disability Advocates and Counseling Group, Inc., against the identical Defendant and property. *See Disability Advocates and Counseling Group, Inc. v. Georgina Betancourt Trust,* No. 04–22879–CIV (S.D. Fla., filed Nov. 12, 2004).